**UNITED STATES of America, Plaintiff-Appellee,**

v.

**HANDY AND HARMAN, a New York corporation, Defendant-Appellant.**

**No. 83–5697.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 9, 1984.

Decided Dec. 28, 1984.

---

George H. Wu., Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Martin S. Zohn, Pacht, Ross, Warne, Bernhard & Sears, Inc., Los Angeles, Cal., for defendant-appellant.

Before BROWNING, Chief Judge, and GOODWIN and KENNEDY, Circuit Judges.

GOODWIN, Circuit Judge.

Handy & Harman appeals from a judgment for the United States for the value of certain metal that Handy & Harman had purchased and in which the Small Business Administration had a security interest perfected in one state but not in the state where collection was attempted.

In 1978, Coronado Trading Co., a New Mexico-based manufacturer of jewelry, borrowed $200,000 from Albuquerque National Bank. The loan was guaranteed by the Small Business Administration. To secure the loan, Coronado gave the bank a security interest in its inventory and accounts receivable. The bank perfected the security interest by filing a financing statement with the appropriate office in New Mexico.

Coronado had a continuing trade relationship with Handy & Harman, a dealer in precious metals. From time to time Coronado purchased gold and silver from Handy & Harman. Coronado also regularly sent scraps of precious metals and crucibles left over from jewelry making, collectively known as "refining lots," to Handy & Harman's refining facilities in California. Handy & Harman's practice was to refine and assay this material, and determine the value of the metal. Coronado could then choose to receive the value of the metal, less charges for refining and assay, in a variety of ways. Coronado could direct Handy & Harman to (1) consign to Coronado's account metals with a value equivalent to that of the refining lot; (2) credit Coronado's account with the dollar amount of the refining lot; or (3) remit the value of the lot directly to Coronado by check.

By June of 1980, Coronado had defaulted on its bank loan, and the bank assigned the loan and security interest to the SBA. After the default but prior to any litigation, Coronado sent several refining lots to Handy & Harman and requested payment by check for the value of the lots after refining. At that time Coronado owed Handy & Harman roughly $30,000 for previous purchases of metal. In July 1980, the Small Business Administration notified Handy & Harman by telephone and in writing that it had a security interest in Coronado's inventory and demanded return of the scraps or of the refined metal.

In November 1980, Handy & Harman informed Coronado that it had credited the value of the June refining lots against Coronado's debt to Handy & Harman. Because the value of Coronado's refining lots was less than the amount of Coronado's debt, Handy & Harman remitted nothing to Coronado or to the government for the refining lots. The government sued Handy & Harman for the return of the metal or its value and prevailed in the district court.

■ Handy & Harman's appeal presents a conflict between the holder of a security interest in collateral, the United States, and a purchaser of that collateral, Handy & Harman. The parties agree that California's version of the Uniform Commercial Code governs this case. See Cal.Com.Code §§ 1105, 9103(1)(b) (West Supp.1984).[1] As a general rule, when collateral subject to a security interest is sold, the security interest continues in both the collateral and in the proceeds generated by the sale. § 9306(2). We must determine the rights of the parties to both the collateral itself and to the proceeds of the collateral.

I. Rights to the collateral.

Except where the code provides otherwise, "a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party...." § 9306(2). Where the collateral consists of goods, such as the refining lots in this case, the code makes two exceptions to this general rule: (1) a buyer in ordinary course of business takes the collateral free of all security interests created by the sell-

1. California has adopted the 1972 text of the Uniform Commercial Code. Hereafter all references to the California Commercial Code will be by section number only.

er of the goods, even perfected ones, § 9307(1); and (2) a buyer not in ordinary course of business takes the collateral with rights superior to unperfected security interests in the collateral if he meets the requirements of § 9301(1)(c). *See* U.C.C. § 9–306 official comment 3 (1977).

Because there is no evidence that the bank or the Small Business Administration authorized the sale of the refining lots outside the ordinary course of business, Handy & Harman must fit within one of these exceptions in order to take the collateral free of the government's security interest.

■ The security agreement between Coronado and the bank authorized Coronado to "sell the Inventory in the ordinary course of business." This authorization applies to the refining lots. They were "inventory" as defined both in the security agreement and in the code. *See* § 9109(4).[2] Because the security agreement uses the code terms "ordinary course of business," we conclude that the security agreement's authorization to sell the collateral has the same effect as § 9307(1), permitting a buyer in ordinary course of business to take the collateral free of all security interests created by the seller. Therefore we do not separately consider whether the sale to Handy & Harman complies with the authorization in the security agreement, but turn directly to the question whether it falls within § 9307(1).

## A. Buyer in ordinary course of business.

Contrary to the district court's conclusion, Handy & Harman does not qualify for status as a buyer in ordinary course of business and thus cannot take the collateral free of the government's security interest under § 9307(1).

■ Section 1201(9) defines "buyer in ordinary course of business." Most important for this case is its proviso that " '[b]uying' may be ... on secured or unsecured credit ... but does not include a transfer ... in total or partial satisfaction of a money debt." By barring a purchaser who takes goods in satisfaction of a debt from ordinary course status, the code requires that a buyer in ordinary course of business give new value for the goods. J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code § 25–13 (2d ed. 1980); Skilton, Buyer in Ordinary Course of Business under Article 9 of the Uniform Commercial Code (and Related Matters), 1974 Wis.L.Rev. 1, 30 n. 75.[3]

■ The new value requirement is central to the functioning of the code's system of inventory financing. Inventory is valuable to a merchant only if he can sell it to his customers. If the merchant's inventory financer could foreclose the security interest in the goods after they had been sold, prospective customers would be reluctant to buy the merchandise. Recognizing this,

---

**2.** The parties agree that the refining lots constitute inventory. The scraps of precious metal found in the refining lots were raw materials used in Coronado's jewelry manufacturing, and thus are within the § 9109(4) definition of inventory. The crucibles contained in the refining lots may have been equipment rather than inventory, *compare* § 9109(2) *with* § 9109(4). But even if the crucibles were not subject to the government's security interest in inventory, the security interest attached to the entire mass of precious metals and crucibles once the two components were commingled in the refining process. § 9315(1)(a).

**3.** The "California Code Comment" supplied by West Publishing Co. to its annotated edition of the California Commercial Code states that "[t]he sale of goods under this definition [buyer

in ordinary course of business] need not be 'for new value' as required under former Civil Code § 3013." Cal.Com.Code § 1201 California code comment 9 (West 1964). If this comment means only that § 1201(9) does not use the term "for new value" as former Civil Code § 3013(1) did (California's version of the Uniform Trust Receipts Act), it is correct. But if the comment means that § 1201(9) does not require a buyer in ordinary course to give new value, it overlooks the exclusion of transfers in satisfaction of money debts, and is wrong. Because not even the official comments to the Uniform Commercial Code control in California, *Citizens Bank of Roseville v. Taggart*, 143 Cal.App.3d 318, 323, 191 Cal.Rptr. 729, 732 (1983), we need not follow this unofficial commentary.

§ 9307(1) facilitates sales of inventory by providing that the ordinary buyer of inventory [4] takes the goods free of any security interest, even if he knows that they are subject to a security interest, so long as he does not have actual knowledge that the sale violates the terms of a security agreement. *See* § 9307(1) and U.C.C. § 9–307 official comment 2 (1977).

At the same time, the rule of § 9307(1) is carefully limited to avoid unduly endangering the position of the inventory financer. By incorporating the definition of buyer in ordinary course of business, § 9307(1) permits a buyer of inventory to take the inventory free of a security interest only if he gives some new value in exchange for the inventory. The inventory financer is protected because his security interest in the inventory will attach to the new value, which constitutes "proceeds" of the inventory. *See* § 9306(2). If the rule were otherwise, and a transferee of inventory who received the goods in satisfaction of a pre-existing debt were permitted to keep them free of security interests, the effect would be to enable an unsecured creditor—the transferee—to bootstrap himself into priority over the secured creditor who looks to the inventory for security. The new value requirement should be strictly construed to preclude the frustration of the code's priority provisions.

■ This case illustrates the problem created when Handy & Harman decided to treat its promise to pay Coronado for the refining lots as subject to a set off against the debt Coronado already owed to Handy & Harman. While the set off was legal, it was inconsistent with the new value requirement. We conclude that Handy & Harman may not claim the status of a buyer in ordinary course of business. Handy & Harman's exercise of the offset created the very problem that the new value requirement was designed to prevent. Because of the offset, Coronado received no money to which the government's security interest could attach. The government is left in exactly the same position that it would occupy if Handy & Harman had never promised to pay Coronado and had taken the collateral in partial satisfaction of Coronado's debt in the first place.

■ We hold only that a buyer of goods on credit cannot qualify for ordinary course status under § 1201(9) if he subsequently offsets his promise to pay with a debt that was in existence at the time he bought the goods. We do not hold that all defenses to, or offsets of, a buyer's promise to pay will disqualify the buyer from status as one in ordinary course of business. It may be, for example, that a buyer of goods on credit could assert a breach of warranty defense to his promise to pay without losing his status as a buyer in ordinary course. We do not decide that question, but note only that such a defense would not have the effect of offsetting the promise to pay with a debt that was in existence at the time the goods were bought.

Our holding is consistent with California law outside the California Commercial Code. As Handy & Harman itself points out, Cal.Civ.Proc.Code § 431.70 (West Supp.1984) permits offset of cross-demands for money as a defense to an action brought on one of the demands. Case law construing former Cal.Civ.Proc.Code § 440,

---

**4.** The official text of U.C.C. §§ 1–201(9) and 9–307(1) (1977) is worded so that only buyers of goods that are inventory in the hands of the seller can take the goods free of security interests. To qualify as a buyer in ordinary course of business, a purchaser must buy goods "from a person in the business of selling goods of that kind." U.C.C. § 1–201(9). If a person is in the business of selling goods, the goods that he holds for sale are necessarily inventory under U.C.C. § 9–109(4) (1977) unless they are farm products in the possession of a debtor engaged in farming operations, U.C.C. § 9–109(3) (1977).

The official version of U.C.C. § 9–307(1) does not permit a buyer in ordinary course of farm products to take them free of security interests, leaving the rule of U.C.C. § 9–307(1) to apply only to purchases of inventory. *See* 2 G. Gilmore, Security Interests in Personal Property § 26.6 (1965).

Cal.Com.Code § 9307(1), unlike U.C.C. § 9–307(1), does not exclude purchases of farm products from its coverage, so in California a buyer in ordinary course may take both inventory and farm products free of security interests created by his seller.

to which § 431.70 is a successor, *see* Cal. Civ.Proc.Code § 431.70 legislative comment (West 1973), holds that cross-demands are deemed paid at the moment that they coexist. *Singer Co. v. County of Kings*, 46 Cal.App.3d 852, 869, 121 Cal.Rptr. 398, 409 (1975); *Hauger v. Gates*, 42 Cal.2d 752, 755, 269 P.2d 609, 611 (1954); Note, Automatic Extinction of Cross-Demands: *Compensatio* from Rome to California, 53 Calif. L.Rev. 224, 264 (1965). Assuming that § 431.70 applies to this case, Handy & Harman's promise to pay would have been deemed offset with the debt Coronado owed Handy & Harman at the moment that Handy & Harman bought the collateral. The purchase of the collateral thus would have been in satisfaction of that pre-existing debt from the outset.

### B. Buyer not in ordinary course of business.

Although Handy & Harman does not qualify as a buyer in ordinary course of business and thus cannot take the collateral free of a perfected security interest, it may qualify for the priority over unperfected security interests that § 9301(1)(c) accords a buyer not in ordinary course of business.

Section 9301(1)(c) subordinates an unperfected security interest in goods to the rights of a "buyer not in ordinary course of business to the extent that he gives value and receives delivery of the collateral without knowledge of the security interest and before it is perfected." Section 9301(1)(c) applies here because the code deems the government's security interest in the collateral to be unperfected as against Handy & Harman.

■ The government's security interest in the collateral was perfected in New Mexico by filing a financing statement with the appropriate office in that state. Section 9103(1)(d)(i) required the government to refile its statement in California within four months of the arrival of the collateral in that state to maintain its perfection.[5] The government did not refile. In the absence of a refiling within four months of the removal of collateral to California, a security interest in the collateral is "deemed to have been unperfected as against a person who became a purchaser after removal." § 9103(1)(d)(i). Handy & Harman qualifies as a purchaser of the collateral even though it did not give new value to Coronado. See §§ 1201(32) and (33). Because Handy & Harman was a purchaser after removal, § 9103(1)(d)(i) provides that the government's security interest is unperfected as against Handy & Harman.

■ The government urges us to ignore the plain language of § 9103(1)(d)(i) and to hold that because the government notified Handy & Harman of its security interest within § 9103's four-month grace period the security interest continued to be "perfected" notwithstanding the government's failure to refile in California. In support of its position the government cites Professors White and Summers, who believe that

As long as the out-of-state secured party asserts his security interest before the four-month period expires, he should not have to refile in order to win. In this setting it makes sense to freeze the relative priorities inside the four month period because that is when the conflict quickens. Thereafter, all that remains are settlement negotiations or trial. A

**5.** Section 9103(1)(d)(i) provides:

(d) When collateral is brought into and kept in this state while subject to a security interest perfected under the law of the jurisdiction from which the collateral was removed, the security interest remains perfected, but if action is required by Chapter 3 of this division to perfect the security interest,

(i) If the action is not taken before the expiration of the period of perfection in the other jurisdiction or the end of four months

after the collateral is brought into this state, whichever period first expires, the security interest becomes unperfected at the end of that period and is thereafter deemed to have been unperfected as against a person who became a purchaser after removal....

In this case, action, *i.e.*, filing, was required to perfect the government's security interest. The government did not take that action within four months of the arrival of the collateral in California.

refiling would add nothing.... Finally, the secured party should win against a nonordinary-course buyer if he asserted his rights within the four-month period. J. White & R. Summers, *supra*, § 23–18 at 974 (footnotes omitted).

We are not persuaded that Professors White and Summers are speaking to the situation presented by our case. Their reference to "settlement negotiations or trial" suggests that they may have in mind a situation where the secured party asserts its security interest by filing suit within the four-month period. In our case the government's only action within the four-month period was to notify Handy & Harman, by telephone and letter, of its security interest and to demand return of the collateral. The government did not file this action to recover the collateral until after the four-month period had expired.

■■■ A secured party's giving notice of its security interest to an intervening purchaser within four months of removal of the collateral to a new state is not sufficient to override the plain language of § 9103(1)(d)(i) and maintain perfection. Notice of a security interest, given privately by a secured party to a purchaser after collateral has been moved from one state to another, is not a satisfactory substitute for public filing of a financing statement, the "action" that § 9103(1)(d)(i) contemplates in most instances. *See* § 9302 (filing of financing statement required to perfect most security interests). The financing statement obviates problems of proof. When a financing statement is filed, a public officer records the date and time of filing so there can be no dispute over whether the refiling took place within four months after removal of the collateral. Private notice, on the other hand, raises evidentiary questions and subjective responses. For example, who in the organization, if anyone, actually received the notice? One purpose of filing is to reduce litigation.

Moreover, a financing statement gives notice to all the world, while private notice, as in this case, may be limited to only one purchaser of the collateral. If notice to less than all the world is sufficient to maintain perfection as against those who receive the notice, circular priorities become a possibility. For example, assume that ordinary goods subject to A's perfected out-of-state security interest are brought into California. Assume that B takes a security interest in the collateral within four months of its arrival and perfects by filing in California. A does not refile in California, but within the four-month period privately notifies B of his security interest. If the government's position is adopted, A is superior to B. Now assume that C also takes a security interest in the collateral and perfects by filing after B. A does not notify C of his security interest and, as already mentioned, does not refile within the four-month period. Under the first-to-file-or-perfect rule of § 9312(5), B is superior to C. But because A neither notified C of A's security interest nor refiled, C is superior to A. In sum: A is superior to B, who is superior to C, who is superior to A. Circular priorities can be resolved, but interpretations of the code that would give rise to them should be avoided. Because the government's position could give rise to circular priorities, we conclude that it is not a *reasonable interpretation of the code.* The government's security interest remained unperfected as against Handy & Harman.

We now must consider whether Handy & Harman meets the other requirements of § 9301(1)(c). Handy & Harman must be a "buyer" of the collateral, and must "give[ ] value and receive[ ] delivery of the collateral without knowledge of the security interest and before it is perfected."

■■■ Handy & Harman is a buyer of the collateral. The code does not define the term "buyer," and "buying" is defined only in the context of a buyer in ordinary course of business. § 1201(9). The code does define the term "sale," however, as "the passing of title from the seller to the buyer for a price." § 2106(1). Handy & Harman's purchase of the collateral qualifies as a sale—title passed and the parties agreed on a price for the goods—and thus

Handy & Harman, as one receiving goods by sale, must be a buyer.

The government never reperfected its security interest in the collateral, so Handy & Harman meets the requirement of taking the collateral before the security interest was perfected. Handy & Harman also received delivery of the collateral and gave value for it because sections 1201(44)(c) and (d) define "value" as accepting delivery under a pre-existing contract for purchase, or any consideration sufficient to support a simple contract.

 However, the record does not show whether Handy & Harman gave value and took delivery without knowledge of the government's security interest. U.C.C. § 9–301 official comment 4 (1977) makes clear that the requirement that a buyer be without knowledge of the security interest applies both to giving value and to taking delivery. The district court found that Handy & Harman bought the collateral without knowledge that the sale was in violation of the government's security agreement, but this is a different question from whether Handy & Harman knew of the security interest. We must remand the case for findings on this point.

Because Handy & Harman may be able on remand to show that § 9301(1)(c) entitled Handy & Harman to priority over the government's unperfected security interest in the collateral, we next consider the rights of the parties to the proceeds of the collateral if the collateral is no longer in existence.

II. Rights in the Proceeds of the Collateral.

 When Handy & Harman bought the refining lots from Coronado, it gave Coronado in return its promise to pay for them. Handy & Harman's promise to pay constitutes the proceeds of the collateral. § 9306(1); *Matthews v. Arctic Tire, Inc.,* 106 R.I. 691, 694, 262 A.2d 831, 833 (1970). In the classification of the code, the promise to pay is an account. § 9106. (The government has a security interest in the

account by virtue of the security agreement and also under § 9306(2).)

Handy & Harman contends that § 9318(1) permits it to offset against the government's claim the $30,000 debt that Coronado owed Handy & Harman. Section 9318(1) provides:

(1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in Section 9206 the rights of an assignee are subject to

(a) All the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and

(b) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

Handy & Harman is the account debtor, and the government is the assignee of the account by virtue of the security agreement and by operation of § 9306. *See* U.C.C. Appendix I § 9–306 (1977) (Reasons for 1972 Change) (secured party has "an automatic right to proceeds, unless otherwise agreed"); *Investment Service Co. v. North Pacific Lumber Co.,* 261 Or. 43, 492 P.2d 470 (1972); *Western Decor & Furnishings Industries, Inc. v. Bank of America National Trust & Savings Association,* 91 Cal.App.3d 293, 302–3, 154 Cal. Rptr. 287, 292 (1979); B. Clark, The Law of Secured Transaction Under the Uniform Commercial Code 11–22, ¶ 11.5 (1980) ("accounts generated as proceeds from the sale of inventory are subject to the rules of § 9–318 just as they would be were they assigned as *original* collateral"). *See also* § 9502(1).

An offset is generally a valid "defense or claim" under § 9318(1). *See, e.g.,* E.A. Farnsworth, Contracts 787–88, § 11.8; Gilmore, *The Assignee of Contract Rights and His Precarious Security,* 74 Yale L.J. 217, 228–29 (1964); 3 Williston, Contracts (3d ed.) 181–82, § 432. We see no reason to depart from the general rule in this case. The government contends that its status as secured lender should alter the operation of

§ 9318(1) and prevent Handy & Harman from asserting the offset. While the argument may have a surface appeal, it does not withstand scrutiny.

The typical inventory financer lends money to the debtor in return for a security interest in inventory and proceeds arising out of the sale of inventory. The security agreement in the case before us conforms to this pattern. If the debtor becomes insolvent, the security interest allows the financer to satisfy his claim against the debtor by taking possession of the collateral, § 9503, and by making collections on the debtor's accounts. § 9502. In the case of inventory that already has been sold and is no longer in the debtor's possession, so long as the security interest still continues in the inventory, the secured party can maintain an action against the purchaser for repossession or conversion. *See* U.C.C. § 9–306 Comment 3 (1977).

■ The typical inventory financer has an additional cause of action against a buyer who has not fully paid his account. This action sounds in contract and is based upon the assignment of the account to the financer as proceeds from the sale of inventory. This action on the account is unrelated to the action for conversion; it exists whether or not there is a cause of action for conversion and whether or not the security interest continues in the collateral. Although the financer has two possible causes of action against a purchaser, one in conversion and the other in contract, he "may of course have only one satisfaction." *Id.*

■ By its terms § 9318 allows a defense only to the suit based on the assignment of the account. Section 9318 does not apply when the suit is for repossession or conversion since the basis for a conversion suit is the secured party's superior property interest in the inventory itself, not the assignment of the account held by the debtor. Thus, so long as the security interest continues in the collateral, the inventory financer need not fear § 9318(1) offsets because an action for conversion is available. It is only when the security

interest has been cut off (*e.g.*, by a buyer in ordinary course or by § 9301(1)(c)) and the financer must resort to an action on the account that § 9318(1) may become a bar to complete satisfaction. But if the security interest has been cut off, there is no reason to favor the inventory financer over the account debtor who has offsets. In the absence of an enforceable security interest, the usual rules of priority favoring secured parties are inapplicable. *See In re Chase Manhattan Bank v. New York*, 40 N.Y.2d 590, 388 N.Y.S.2d 896, 357 N.E.2d 366 (1976); *Investment Service Co. v. North Pacific Lumber Co.*, 261 Or. 43, 492 P.2d 470 (1972). In sum, § 9318 should not be interpreted to restore the inventory financer to the preferred status of a secured party when that preference has been taken away by other provisions of the code. *See, e.g.*, §§ 9301(1)(c), 9307. *See generally*, Nickles, Enforcing Article 9 Security Interests Against Subordinate Buyers of Collateral, 50 Geo.Wash.L.Rev. 511, 548–52 (1982).

The case before us fits this pattern. The § 9318 offset issue arises only if the district court finds the government's security interest has been cut off by § 9301(1)(c). There may be cases where the inventory financer wants to maintain an action on the debt even though the security interest continues in the collateral and an action for conversion would be possible. This would not change our interpretation of § 9318, however. The financer must choose between the two theories of recovery, either suing for conversion as a secured party and thereby avoiding possible § 9318 defenses, or suing on the account as an assignee and being subject to § 9318 defenses.

We recognize that the inventory financer has legitimate interests to be protected. But the account debtor's interest is no less legitimate. In the leading case of *Seattle-First National Bank v. Oregon Pacific Industries, Inc.*, 262 Or. 578, 582, 500 P.2d 1033, 1035 (1972), the Supreme Court of Oregon discussed the tensions that led to the compromise in § 9318:

It was necessary to permit at least some setoffs to be asserted in order to protect the obligor from being unduly prejudiced by the assignment; but this right of setoff had to be limited in order to give some value and stability to the assignment so that it could be used as an effective security device. If an obligor could not assert any of the defenses or setoffs against an assignee which he could have asserted against his creditor, the assignor, the obligor would be extremely prejudiced by an assignment. On the other hand, if the obligation assigned could be obliterated or diminished by events happening after the assignment and notice of assignment to the obligor, the assignment would be precarious collateral.

 The code in other circumstances penalizes a secured lender who fails to monitor his debtor's activities. *See, e.g.,* §§ 9103(1), 9306(3). We think the secured lender should also bear the risk that, if his security interest fails and an action on the account is necessary, unsecured creditors may have setoffs arising out of the debtor's activities.

The cases cited by the government in opposition are unpersuasive. *Associates Discount Corp. v. Fidelity Union Trust Co.,* 111 N.J.Super. 353, 268 A.2d 330 (1970), and *Citizens National Bank v. Mid-States Development Co.,* 177 Ind.App. 548, 380 N.E.2d 1243 (1978), are not on point because they deal with offsets against cash proceeds held by banks in deposit accounts. Cash proceeds are not "accounts" within the meaning of the code, *see* § 9106, and § 9318(1) is thus not applicable. In *First National Bank & Trust Co. v. Iowa Beef Processors, Inc.,* 626 F.2d 764 (10th Cir.1980), the court refused to permit an offset against a security interest claimed in an account as proceeds. The only authorities cited, however, were *Associates Discount Corp.* and *Citizens National Bank* which, as noted, are not on point. We think the court in *Iowa Beef* misconceived the issue and created an unwarranted exception to the operation of § 9318. *See* Nickles, Enforcing Article 9 Security Interests Against Subordinate Buyers of Collateral, 50 Geo.Wash.L.Rev. 511, 548–52 (1982). The *Iowa Beef* court should have focused instead on whether the account debtor in that case was a buyer in ordinary course who took the collateral free of the security interest.

 We conclude that Handy & Harman may, pursuant to § 9318(1), offset the debt that Coronado owes it against the account in which the government had an unperfected security interest.

III. Conclusion.

The judgment of the district court is vacated and the cause is remanded for findings on whether Handy & Harman gave value and took delivery of the collateral without knowledge of the government's security interest. If Handy & Harman did so without knowledge, its interests are superior to those of the government, and judgment shall be entered in its favor. If Handy & Harman gave value and took delivery with knowledge of the government's security interest, judgment shall be entered for the government.

Vacated and remanded for further proceedings, neither party to recover costs in this court.