819 F.2d 1227
 3 UCC Rep.Serv.2d 1297
 AIRCRAFT TRADING AND SERVICES, INC., Plaintiff-Appellant,
v.
BRANIFF, INC., William Condren, International Air Leases,
Inc., Pride Air, Inc., Defendants,
Braniff, Inc., William Condren, International Air Leases,
Inc., Appellees.
 No. 807, Docket 86-7981.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 13, 1987.
Decided May 22, 1987.
 
 Donald S. Zakarin, New York City (David Nicholas, Pryor, Cashman, Sherman & Flynn, New York City, of counsel), for plaintiff-appellant.
 Richard M. Kraver, New York City (Lewis S. Fischbein, Kraver & Parker, New York City, of counsel), for defendant-appellee Braniff, Inc.
 (Jeffrey A. Fillman, Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, New York City, of counsel), for defendants-appellees William Condren and Intern. Air Leases, Inc.
 Before FEINBERG, Chief Judge, PIERCE and MINER, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Plaintiff-appellant Aircraft Trading and Services, Inc. ("ATASCO") appeals from a judgment entered in the United States District Court for the Southern District of New York (Goettel, J.) in favor of defendants-appellees Braniff, Inc., William Condren, and International Air Leases, Inc. ("IAL"), following ATASCO's motion for summary judgment against IAL only and defendants' cross-motion for summary judgment. ATASCO's action arose out of its sale of a jet aircraft engine, subject to a chattel mortgage that secured the payment of the purchase price, to Northeastern Airlines. ATASCO failed to record the chattel mortgage with the Federal Aviation Administration ("FAA"), as required for perfection of its security interest under the Federal Aviation Act of 1958, 49 U.S.C. Secs. 1403-1406 (1982 & Supp. III 1985) ("the Act"), until after the engine had been conveyed by Northeastern to Braniff, and then by Braniff to Condren, culminating in a lease from Condren to IAL with an option to purchase. IAL subsequently exercised its option to buy after ATASCO recorded its interest and after IAL had actual notice of ATASCO's security interest in the engine. ATASCO brought suit for conversion, replevin and forfeiture of the engine, claiming that its rights were superior to those of Braniff, Condren, and IAL.
 
 
 2
 The district court denied ATASCO's motion for summary judgment against IAL and granted defendants' cross-motion for summary judgment, finding that the intermediate transfers of the engine, prior to ATASCO's perfection of its security interest, extinguished ATASCO's security interest under 49 U.S.C. Sec. 1403(c). On appeal, ATASCO asserts that its interest in the engine is superior to IAL's under U.C.C. Article 9. We find merit in ATASCO's claim and reverse the denial of ATASCO's motion for summary judgment against IAL. We affirm the grant of defendants' cross-motion for summary judgment as to Braniff and Condren, but reverse as to IAL.
 
 BACKGROUND
 
 3
 In December 1982, ATASCO, a Panamanian company engaged in the business of selling and leasing aircraft and aircraft engines, sold a jet aircraft engine to Northeastern Airlines ("Northeastern"), a commercial airline carrier. The purchase price of the engine was $412,344.00. The sales agreement provided that Northeastern would pay ATASCO $36,000.00 as a down payment, with the balance to be paid in 36 equal installments of $10,454.00, due monthly, beginning in March 1983. Northeastern's obligation to pay the debt was secured by a chattel mortgage dated December 31, 1982, held by ATASCO. The chattel mortgage provided that Northeastern would be in default if it (1) failed to pay any note when due; (2) disposed of the engine before all payments were made; or, (3) was subject to bankruptcy proceedings.
 
 
 4
 Northeastern paid the monthly installments on the engine through January 10, 1985, but has made no payments since then, and is now in bankruptcy. The balance due on the engine is $135,902.00 plus interest. ATASCO failed to record the chattel mortgage with the FAA, as required under 49 U.S.C. Sec. 1403(c), until March 1985.
 
 
 5
 On November 28, 1984, Northeastern agreed to sell the aircraft containing the engine subject to ATASCO's chattel mortgage to Braniff, a commercial airline carrier. Northeastern, in its bill of sale to Braniff, represented that it was conveying good and marketable title for both the aircraft and the engine. Braniff, which was planning to sell this aircraft immediately to William Condren, a private individual, checked the FAA records for prior claims or liens upon the aircraft or its parts, and found no record of any incumbrances. After the sale to Braniff was consummated, Braniff filed the bill of sale with the FAA on November 30, 1984. On December 7, 1984, Braniff sold the aircraft to Condren after Condren also checked the FAA records for a prior claim. Condren subsequently filed his bill of sale.
 
 
 6
 In early February 1985, Condren leased the aircraft, with an option to buy, to IAL. The lease was not filed with the FAA as required by 49 U.S.C. Sec. 1403. ATASCO finally filed its chattel mortgage with the FAA in March of 1985. In April of 1985, IAL learned of ATASCO's chattel mortgage when Condren notified IAL of ATASCO's interest by letter. Nevertheless, in late July or early August of 1985, after procuring a copy of ATASCO's chattel mortgage directly from the FAA, IAL exercised its option to buy the aircraft. That bill of sale was filed with the FAA on August 5th.
 
 
 7
 ATASCO brought suit for conversion, replevin, and forfeiture against Braniff, Condren and IAL. ATASCO's central contention before the district court was that its rights were superior to those of IAL because its chattel mortgage was filed prior to IAL's filing, and IAL had actual knowledge of the terms of the instrument when it exercised its option to purchase. The district court granted summary judgment in favor of IAL, Condren, and Braniff, noting that if the only transaction at issue were the sale to IAL, then ATASCO might prevail. However, the district court ruled that, because of the intermediate transfers to Braniff and Condren prior to ATASCO's filing of the chattel mortgage, Braniff received good title and passed good title to Condren, who in turn passed good title to IAL.
 
 DISCUSSION
 A. The Federal Aviation Act
 
 8
 Under the Federal Aviation Act, an interest in aircraft or aircraft engines, including a chattel mortgage, see 49 U.S.C. Sec. 1403(a), is not valid against an innocent third party[1] "until such conveyance or other instrument is filed for recordation in the office of the Secretary of Transportation." 49 U.S.C. Sec. 1403(c). Federal law thus requires recordation with the FAA to perfect a security interest in an aircraft engine. The district court, relying on the language and purpose of 49 U.S.C. Sec. 1403, concluded that Congress must have intended intervening conveyances to render invalid the late recordation of a security interest in an aircraft engine. Therefore, the court denied plaintiff's motion for summary judgment and granted defendants' cross-motion for summary judgment.
 
 
 9
 The district court interpreted section 1403(c) of the Act to mean that a security interest in an aircraft engine is void unless filed with the FAA before the engine is conveyed again. This reading misinterprets the phrase "until such conveyance or other instrument is filed," 49 U.S.C. Sec. 1403(c) (emphasis added). The district court's construction effectively replaces "until" with "unless," and reads into the statute a timely filing requirement. "The use of the word 'until' ... rather than 'unless' indicates that mere delay ... [is] not enough to cause forfeiture." Washingtonian Pub. Co. v. Pearson, 306 U.S. 30, 39, 59 S.Ct. 397, 402, 83 L.Ed. 470 (1939) (rejecting argument that failure promptly to register copyright precluded infringement claim, where Copyright Act of 1909 provided that no action could be maintained "until" registration requirements were complied with).
 
 
 10
 The purpose of section 1403 is "to create 'a central clearing house for recordation of titles so that a person, wherever he may be, will know where he can find ready access to the claims against, or liens, or other legal interests in an aircraft.' " Philko Aviation, Inc. v. Shacket, 462 U.S. 406, 411, 103 S.Ct. 2476, 2479, 76 L.Ed.2d 678 (1983) (quoting Hearings on H.R. 9738 before the House Committee on Interstate and Foreign Commerce, 75th Cong., 2d Sess. 407 (1938) (testimony of F. Fagg, Director of Air Commerce, Dep't of Commerce)). Guided by this statement, the Supreme Court ruled that section 1403 preempts state laws that allow unrecorded interests in aircraft to affect innocent third parties. Philko Aviation, 462 U.S. at 412, 103 S.Ct. at 2479. The district court, relying on this language, stated that
 
 
 11
 it would make no sense for Congress to have established such a registry if someone with an unfiled security interest could come along years after the interest was created, and after subsequent purchasers had relied upon the absence of any adverse claims on file with the FAA, and nevertheless succeed in asserting a priority interest in an aircraft or its parts.
 
 
 12
 The district court's conclusion ignores both the Supreme Court's limitation on the Act's preemption of state law, and section 1406 of the Act. Section 1406 provides that "[t]he validity of any instrument the recording of which is provided for by section 1403 of this title shall be governed by the laws of the State ... in which such instrument is delivered." 49 U.S.C. Sec. 1406. Under the plain language of this section, state law determines validity. Citing with favor In re Gary Aircraft Corp., 681 F.2d 365 (5th Cir.1982) (rejecting contention that section 1403 preempts all state laws dealing with priority of interests in aircraft), cert. denied, 462 U.S. 1131, 103 S.Ct. 3110, 117 L.Ed.2d 1366 (1983), the Supreme Court in Philko Aviation concluded:
 
 
 13
 Although state law determines priorities, all interests must be federally recorded before they can obtain whatever priority to which they are entitled under state law. As one commentator has explained: "The only situation in which priority appears to be determined by operation of the [federal] statute is where the security holder has failed to record his interest. Such failure invalidates the conveyance as to innocent third persons. But recordation itself merely validates; it does not grant priority." Scott, Liens in Aircraft: Priorities, 25 J. Air L. & Commerce 193, 203 (1958) (footnote omitted).
 
 
 14
 Philko Aviation, 462 U.S. at 413, 103 S.Ct. at 2480 (emphasis added). See also Haynes v. General Electric Credit Corp., 582 F.2d 869, 870 (4th Cir.1978) (per curiam) (Act does not preempt U.C.C. rule that buyer in ordinary course of business takes free of a security interest created by his seller); Sanders v. M.D. Aircraft Sales, Inc. 575 F.2d 1086, 1088 (3d Cir.1978) (same); R.A. Anderson, Anderson on the U.C.C. Sec. 9-104:12, at 537-38 (3d ed. 1985). We note that resort to state law for priority rules avoids the need for a separate federal priority system for aircraft.
 
 
 15
 Under the teaching of Philko Aviation, the first to perfect by filing with the FAA is not necessarily assured priority. Philko Aviation, 462 U.S. at 413, 103 S.Ct. at 2480. Rather, because section 1403 requires recordation to validate or perfect the security interest, federal law will only determine priority where the security holder has not recorded his interest. Id. An interest that intervenes before a creditor perfects under section 1403 does not necessarily extinguish the creditor's subsequently recorded security interest. In such a situation, a court must look to state law to determine priority. See South Shore Bank v. Tony Mat, Inc., 712 F.2d 896, 899 (3d Cir.1983) (state law determines priority where buyer of airplane eventually recorded ownership with FAA after bank with intervening security interest brought suit).
 
 
 16
 In the case before us, although both Braniff and Condren purchased the engine and filed with the FAA prior to the time that ATASCO filed and perfected its interest,[2] ATASCO eventually did file and perfect in March of 1985. Therefore, state law determines priority as between ATASCO and Braniff and Condren, and as between ATASCO and IAL. All parties concede that New York's Uniform Commercial Code applies to determine priority in this case. We therefore turn to an analysis of the New York U.C.C., particularly Article 9, to determine how ATASCO's late perfected security interest should be treated.
 
 B. The Uniform Commercial Code
 1. Buyer in the Ordinary Course of Business
 
 17
 Appellees contend that, under New York's Uniform Commercial Code section 9-307(1), Braniff was a buyer in the ordinary course of business who could subsequently convey the engine free of ATASCO's security interest. Section 9-307 provides:
 
 
 18
 (1) A buyer in ordinary course of business ... takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.
 
 
 19
 N.Y.U.C.C. Law Sec. 9-307(1) (McKinney 1964). It generally is recognized that the purpose of section 9-307(1) is to protect the buying public where the secured party finances inventory that is sold to the public by the debtor in the regular course of the debtor's business. J. White & R. Summers, Uniform Commercial Code Sec. 25-13, at 1067 (2d ed. 1980); N.Y.U.C.C. Law Sec. 9-307 practice commentary 1 (McKinney 1964).
 
 
 20
 Under section 9-307(1), if Braniff were a buyer in the ordinary course of business, it would "take free" of the security interest created by its seller, Northeastern, extinguishing ATASCO's interest, whether or not ATASCO subsequently perfected. Section 9-307(1) thereby provides an exception to the general rule, codified in section 9-306(2), that "a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party." N.Y.U.C.C. Law Sec. 9-306(2) (McKinney Supp.1987).
 
 
 21
 A buyer in the ordinary course of business is defined as "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind...." N.Y.U.C.C. Law Sec. 1-201(9) (McKinney Supp.1987) (emphasis added). This definition requires, inter alia, that the buyer in ordinary course buy from a seller who ordinarily sells similar goods. ATASCO argues that Northeastern, an airline carrier, was not in the business of selling airplanes, and therefore Braniff was not a buyer in the ordinary course of business. Appellees counter that it is a practice in the airline industry for airlines periodically to sell off airplanes and therefore Northeastern sold the plane to Braniff in the ordinary course of business.
 
 
 22
 Northeastern evidently was selling jets and engines to upgrade its fleet, which may be a practice in the industry. However, under New York law, whether a sale is an ordinary sale of similar goods turns on whether the goods sold are classified as capital equipment or as inventory. In Hempstead Bank v. Andy's Car Rental Sys., 35 A.D.2d 35, 312 N.Y.S.2d 317 (2d Dep't 1970), the court held that a rental company's used car sales were not in the ordinary course of business, even though such sales are common in the industry, because the used cars were capital equipment of the leasing company and not inventory. Accord Sindone v. Farber, 105 Misc.2d 634, 432 N.Y.S.2d 778 (Sup.Ct.1980). IAL's reliance on Tanbro Fabrics Corp. v. Deering Milliken, Inc., 39 N.Y.2d 632, 350 N.E.2d 590, 385 N.Y.S.2d 260 (1976), is misplaced. In Tanbro Fabrics the unfinished textiles sold off by a converter were inventory and not capital equipment. Therefore, the sale was in the ordinary course of business, a result that accords with the Hempstead Bank holding. See 69 Am.Jur.2d Secured Transactions Sec. 469, at 328 (1973) ("a buyer of collateral that is classified as equipment will rarely if ever be a buyer in ordinary course of business, even where the debtor makes it a regular practice to sell used or obsolescent equipment at regular intervals").
 
 
 23
 Northeastern's aircraft and engines clearly were capital equipment. See N.Y.U.C.C. Law Sec. 9-109(2) (McKinney 1964). Therefore, we hold that the sale to Braniff was not in the ordinary course of business, and section 9-307(1) does not extinguish ATASCO's security interest. We note that neither Condren nor IAL attempts to establish status as a buyer in the ordinary course of business. Even if Condren or IAL qualified as a buyer in the ordinary course of business, however, they would be unable to avail themselves of section 9-307(1) protection because section 9-307(1) applies only to security interests created by the buyer's seller. Here, Northeastern created the security interest and therefore Braniff was the only party in a position to invoke section 9-307(1) in its own right.
 
 
 24
 2. Priority Between ATASCO and Braniff & Condren
 
 
 25
 We now turn to a determination of the strength of ATASCO's claim as against Braniff and Condren. Section 9-301(1) provides that:
 
 
 26
 (1) an unperfected security interest is subordinate to the rights of
 
 
 27
 * * *
 
 
 28
 (b) a person who becomes a lien creditor before the security interest is perfected;
 
 
 29
 (c) in the case of goods, instruments, documents, and chattel paper, a person who is not a secured party and who is a transferee in bulk or other buyer not in ordinary course of business ... to the extent that he gives value and receives delivery of the collateral without knowledge of the security interest and before it is perfected.
 
 
 30
 N.Y.U.C.C. Law Sec. 9-301(1) (McKinney Supp.1987) (emphasis added). Both Braniff and Condren bought without knowledge of ATASCO's security interest and before it was perfected. Therefore, as buyers not in the ordinary course of business, their respective rights to the engine were superior to ATASCO's, by application of section 9-301(1)(c).
 
 
 31
 It is critical to note for the discussion that follows that ATASCO's unperfected security interest, though subordinate, continued to exist. Section 9-301(1) explicitly provides that "an unperfected security interest is subordinate " to the rights of certain buyers and lien creditors. The language of subordination indicates that the secured party's rights live on, although junior to the buyer's rights. Contrast the language of section 9-307--"[a] buyer in ordinary course ... takes free of a security interest created by his seller"--which terminates the secured party's interest for all time. Some courts seemingly ignore the subordination language of section 9-301(1) and state that a senior buyer "takes free" of an unperfected security interest, see, e.g., United States v. Handy & Harman, 750 F.2d 777, 780-81 (9th Cir.1984); In re Miguel, 30 B.R. 896, 898 (Bankr.E.D.Cal.1983), but those cases do not involve subsequent buyers and apparently use the phrases "takes free" and "has priority over" interchangeably. One commentator has suggested that the U.C.C. drafters intended that an unperfected security interest terminates upon subsequent sale of the collateral to a buyer not in the ordinary course of business, but that an unperfected security interest subject to a senior lien continues. D.G. Carlson, Death and Subordination Under Article 9 of the Uniform Commercial Code: Senior Buyers and Senior Lien Creditors, 5 Cardozo L.Rev. 547, 553-57 (1984). We decline, however, to interpret section 9-301(1) in a manner that would give "subordinate" two different meanings in the same sentence depending upon the particular subsection that is relevant to the case at bar--section 9-301(1)(c) (buyers not in the ordinary course of business) or section 9-301(1)(b) (lien creditors). Rather, we are convinced that a plain reading of the statute requires that "subordinate" be given consistent meaning within section 9-301, and that the difference in phrasing between sections 9-301(1) ("is subordinate") and 9-307 ("takes free") is to be given effect, notwithstanding cases that use language of termination interchangeably with language of subordination.
 
 3. Shelter Provision of Article 2, Sales
 
 32
 Appellees argue that if Braniff and Condren are buyers not in the ordinary course of business, their priority over ATASCO's security interest under section 9-301(1) would pass to IAL with the conveyance. Relying on the shelter provision of Article 2, Sales, section 2-403, appellees assert that Braniff conveyed title to Condren, and Condren conveyed that title to IAL, subject at most to ATASCO's subordinated unperfected security interest. Section 2-403 provides that:
 
 
 33
 (1) [a] purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased.
 
 
 34
 N.Y.U.C.C. Law Sec. 2-403(1) (McKinney 1964). Appellees have directed us to no authority for their assertion that the shelter provision of Article 2 may be applied to immunize transferees from a buyer who is protected under section 9-301(1)(c). It is a novel theory that we believe must fail.
 
 
 35
 Appellees' reliance on In re Gary Aircraft Corp., 681 F.2d 365 (5th Cir.1982), is misplaced. In Gary Aircraft, the secured party contended that it was entitled to possession of an aircraft because the last purchaser in the chain of sale was not a purchaser for value without notice, and therefore could not escape the secured party's interest as a buyer in the ordinary course of business. Rejecting that analysis, the Fifth Circuit held that the last purchaser was not subject to the secured party's interest because an intervening purchaser qualified under section 9-307 as a buyer in the ordinary course of business. That special status of the intervening purchaser extinguished the security interest in the collateral such that a subsequent sale could not resurrect it, and the last purchaser therefore prevailed.
 
 
 36
 New York law is in agreement. See Marine Midland Bank, N.A. v. Smith Boys, Inc., 129 Misc.2d 37, 41, 492 N.Y.S.2d 355, 358 (Sup.Ct.1985) (if any party in the chain of title takes free of the security interest under section 9-307, "all succeeding buyers likewise take free of the security interest"). However, this is a narrow exception to the general rule stated in section 9-306(2) that a security interest in collateral continues upon the sale of the collateral unless the sale was authorized by the secured party. Id. at 43, 492 N.Y.S.2d at 360. The case before us does not fall within this narrow exception because ATASCO's security interest was not extinguished, but merely subordinated, by the sale to Braniff: Braniff did not "take free" of ATASCO's interest under section 9-307; it took subject to ATASCO's subordinated claim. See T.M. Quinn, Uniform Commercial Code Commentary and Law Digest p 9-306[A], at 9-169 (1978) ("[A]nyone dealing with the collateral deals with it subject to the continuing security interest.").
 
 
 37
 As the Fifth Circuit recognized in Gary Aircraft, "the rule is that section [2-403(1) ] is not available to save one who buys when the seller's title is subject to a security interest but who does not qualify under section [9-307]" for preferred status as a buyer in the ordinary course of business.[3] Gary Aircraft, 681 F.2d at 377. See Commercial Credit Equipment Corp. v. Bates, 159 Ga.App. 910, 285 S.E.2d 560 (1981). But see Executive Financial Services, Inc. v. Pagel, 238 Kan. 809, 715 P.2d 381 (1986) (buyer in the ordinary course of business may prevail on "entrustment" theory under sections 2-403(2) and (3) even though he could not prevail under section 9-307(1)). Similarly, in National Shawmut Bank v. Jones, 108 N.H. 386, 388, 236 A.2d 484, 486 (1967), the court recognized section 9-307 as the only provision of Article 9 "under which a buyer of goods can claim to take free of a security interest where a sale, exchange or other disposition of the collateral was without consent of the secured party.... Article 9-306(2) gives the court no leeway to create any other exceptions to its dictates." Accord Matteson v. Harper, 297 Ore. 113, 117, 682 P.2d 766, 769 (1984). See J. White & R. Summers, Uniform Commercial Code Sec. 25-15, at 1073 (2d ed. 1980).
 
 
 38
 We find further support for this rule in other sections of the U.C.C. Section 9-306(2) provides for continuance of a security interest upon sale of the collateral "[e]xcept where this Article otherwise provides." We interpret this clause as expressly limiting exceptions to those found within Article 9. Moreover, section 2-402(3)(a) specifies that "[n]othing in this Article shall be deemed to impair the rights of creditors of the seller ... under the provisions of [Article 9]." We conclude that the general scheme of the U.C.C. contemplates that a security interest is to be governed by Article 9, unimpaired by Article 2. See National Shawmut, 108 N.H. at 389, 236 A.2d at 486; J.I. Case Credit Corp. v. Foos, 11 Kan.App.2d 185, 188-89, 717 P.2d 1064, 1067 (1986); Carlson, supra, at 550 n. 9 & 556 ("section 2-403 does not contemplate the destruction of unperfected security interests"); Anderson, supra, Sec. 9-102:9, at 453. Furthermore, the drafters of the U.C.C. explicitly provided shelter elsewhere in Article 9. See N.Y.U.C.C. Law Sec. 9-302(2) (McKinney Supp.1987) ("If a secured party assigns a perfected security interest, no filing under this Article is required in order to continue the perfected status of the security interest against creditors of and transferees from the original debtor."). "[T]heir failure to do so in section 9-301(1)(c) should be taken as significant." Carlson, supra, at 558.
 
 
 39
 Finally, we note that the U.C.C. does not require a security interest to be filed immediately or promptly, Anderson, supra, Sec. 9-302:20, at 77-78, although it is the most prudent course for a cautious lender. Delay in perfection does not preclude perfected status at a later time upon filing. While the secured party's interest may be subordinated to interests of others arising prior to filing, "[h]e can, of course, file, even after a delay, and protect himself against interests arising subsequent to such filing." 53 N.Y.Jur. Secured Transactions Sec. 175, at 152 (1967); 69 Am.Jur.2d Secured Transactions Sec. 422, at 271 (1973); Anderson, supra, Sec. 9-301:9, at 29-30. The rule appellees urge us to adopt effectively would freeze a secured party's priority status as of the time of the first intervening conveyance: If one failed to file a security interest the day of the sale, the buyer could, by immediately reselling, forever destroy the security interest. While appellees urge that their rule would result in an increment of certainty in such transactions, we believe that such an extreme result would discourage lenders from taking security interests and would thereby inhibit commerce. The U.C.C. does not attempt to remove all uncertainty from secured transactions. It provides automatic perfection in certain situations, see N.Y.U.C.C. Law Secs. 9-302(1)(b) (10-day automatic perfection for documents, proceeds), 9-302(1)(d) (purchase money security interest in consumer goods), & 9-304(4) (21-day automatic perfection for certain instruments) (McKinney Supp.1987), and allows a filing to relate back to the time of attachment in others, see N.Y.U.C.C. Law Secs. 9-103(1)(d), 9-103(3)(e) (McKinney Supp.1987) (in multistate transaction, secured party has four months to file in state to which collateral has been removed). The U.C.C. aims to balance the competing concerns of protection for secured lenders and encouragement of trade.
 
 4. Priority Between ATASCO and IAL
 
 40
 Having determined that ATASCO's security interest was not extinguished by the subsequent conveyances to Braniff and Condren, we now address the priority in the engine as between ATASCO and IAL.
 
 
 41
 At the time the engine was conveyed from Northeastern to Braniff and then to Condren, ATASCO's claim was subordinate to Braniff's and Condren's under section 9-301, as discussed above, because it was unfiled and unperfected. However, ATASCO eventually did file and perfect its security interest, and therefore section 9-301, which determines priority where an interest is unperfected, has no bearing on the issue of priority as between ATASCO and IAL, who have competing perfected interests in the engine.
 
 
 42
 Section 9-312(5)(a), the catch-all priority section of Article 9, governs conflicts between competing perfected interests:
 
 
 43
 Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.
 
 
 44
 N.Y.U.C.C. Law Sec. 9-312(5)(a) (McKinney Supp.1987). As previously discussed, section 1403 of the Federal Aviation Act requires filing with the Secretary of the FAA to perfect an interest in an aircraft engine. Therefore, time of filing is identical to time of perfection in the case before us. Under section 9-312(5)(a), the first to file an interest with the FAA will rank first in priority. It is undisputed that ATASCO filed its chattel mortgage with the FAA in March 1985, and IAL filed its interest on August 5, 1985. Therefore, under the first to file or perfect rule of section 9-312(5)(a), ATASCO's security interest in the engine has priority over IAL's interest. We therefore reverse the district court's grant of summary judgment in favor of IAL and the denial of ATASCO's motion for summary judgment as against IAL, and remand the case for a determination of damages.
 
 C. Sanctions
 
 45
 Appellees request that we award double costs and attorney's fees against appellant for bringing an appeal "totally lacking in merit, framed with no relevant supporting law, conclusory in nature, and utterly unsupported by the evidence." As is clear from our discussion of appellant's claims, we are of the view that this appeal was highly meritorious and well supported by relevant law. But even if we are wrong, the issues obviously are not frivolous. Appellees' request for sanctions therefore borders on the frivolous, and we caution that we will not hesitate to impose appropriate penalties in the future for frivolous requests for sanctions.
 
 CONCLUSION
 
 46
 For the reasons stated above, we reverse the district court's grant of summary judgment in favor of IAL. We affirm the district court's grant of summary judgment for Braniff and Condren, on the grounds herein stated. We reverse the denial of ATASCO's summary judgment motion as against IAL, and remand for a determination of damages and entry of judgment.
 
 
 
 [1]
 Section 1403(c) invalidates an unfiled interest in an aircraft as against "any person other than the person by whom the conveyance or other instrument is made or given, his heir or devisee, or any other person having actual notice thereof...." 49 U.S.C. Sec. 1403(c)
 
 
 [2]
 The date of perfection of a security interest in aircraft generally is held to coincide with the date that the security interest is filed for recordation. In re Gelking, 754 F.2d 778, 780 (8th Cir.), cert. denied, 473 U.S. 906, 105 S.Ct. 3529, 87 L.Ed.2d 653 (1985)
 
 
 [3]
 IAL purchased with knowledge of ATASCO's security interest after ATASCO filed and perfected its claim. Therefore IAL cannot invoke protection in its own right under section 9-301(1)(c)