LONGTREE, LTD., a Delaware limited partnership consisting of Diehl Lumber Products, Inc., and Tricon U.S.A., as general partners, Appellant (Defendant),

Pacific Star, Inc., a Washington corporation, dba Star Studs Company; Bio-Mass Supply, Inc., a Washington corporation; Diehl Lumber Company, a Utah corporation; Darrell Jones, aka Darrell M.B. Jones, aka Darrell M. Jones, individually; Terry Diehl, individually; Larry Beck, individually; and Mercedes Timber, Inc., a Utah corporation (Defendants),

v.

RESOURCE CONTROL INTERNATIONAL, INC., Appellee (Plaintiff).

No. 87-45.

Supreme Court of Wyoming.

May 5, 1988.

Rehearing Denied June 2, 1988.

Harry L. Harris of Harris & Harris, Evanston, and Thomas F. Dailey (argued), Princeton, N.J., for appellant.

Dennis L. Sanderson, Afton, for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

Appellee Resource Control International (RCI) filed this action against Longtree, Ltd. (Longtree) and various other defendants for conversion of a quantity of logs in which it had an interest. Following a bench trial, the district court found that RCI had an unperfected security interest in the logs and that Longtree, which claimed a superior security interest in the logs, was a buyer not in the ordinary course of business which purchased the logs with knowledge of RCI's security interest. The court entered judgment for RCI, and Longtree now appeals, asserting that the district court erred in the following respects: (1) in ruling that Longtree's perfected security interest in the logs was unenforceable; (2) in ruling that RCI's unperfected security interest was enforceable; (3) in ruling that RCI's unperfected security interest was entitled to priority over Longtree's perfected interest; (4) in failing to strike hearsay testimony concerning statements made by Darrell Jones; (5) in ruling that a cash bond posted by Longtree was not subject to the Bank of California's perfected security interest in proceeds from the logs; (6) in ruling that RCI's continued delivery of logs to Pacific Star on credit did not constitute future advances; and (7) in awarding RCI the full value of the logs rather than the value of RCI's unperfected security interest in the logs.

We affirm the judgment of the district court.

## FACTS

In 1980, Darrell Jones obtained a loan in the amount of $1,620,000 guaranteed by the Farmers' Home Administration and another loan in the amount $180,000, both from the Star Valley State Bank in Afton, Wyoming. The loans were secured by a mortgage on the real estate upon which a sawmill was located and by a security interest in the mill equipment and machinery. The proceeds of the loan were used to acquire the sawmill in Afton, Wyoming. The assets of the sawmill were held in the name of Star Development, a trade name used by Jones. The sawmill assets were in turn leased to Pacific Star, which operated the sawmill under the trade name Star Studs Company.

In October 1981, Pacific Star and Jones executed two notes in favor of the Bank of California, one a simple promissory note in the sum of $1,000,000, and the other a revolving credit note in the sum of $1,500,000. These notes were secured by a mortgage on the sawmill and by security agreements covering equipment and

"[a]ll inventory, raw materials, equipment including but not limited to * * * sawmill supplies, work in progress and materials used or consumed in Debtor's business, now owned or hereafter acquired, and all accounts, contract rights, chattel paper, instruments, general intangibles and rights to payment of every kind, now or hereafter arising in favor of Debtor out of Debtor's business and all Debtor's right in returned or repossessed goods."

The security agreement also covered proceeds of such collateral. The Bank of California perfected its security interest by filing.

In December 1981, Pacific Star and Jones defaulted on the Star Valley State Bank and Bank of California loans. In 1982, the Bank of California shut down the mill and worked out an agreement so that Jones could run the mill long enough to mill the logs already on hand. After those logs had been processed and the lumber had been sold and removed from the mill site, the mill was again shut down and the equipment was auctioned.

In an effort to reopen the mill, Jones sought to establish a cogeneration facility next to the mill which would utilize wood, wood waste, and residue to produce steam which would in turn be used in the mill's dry kilns and would also generate electricity for sale to Idaho Power and Light. Jones contacted Jerry Harmon, manager of RCI, in an effort to obtain a supply of logs to process in the mill. Because of the Bank of California's outstanding security interest covering raw materials, Harmon was reluctant to sell logs to Jones on credit. Consequently, RCI and Jones agreed that RCI would borrow operating funds from the American National Bank of Afton, and the funds would be secured by Pacific Star's log deck and the fuel pile for the cogeneration plant. The agreement provided that title to the logs would remain in RCI until the logs were introduced into the manufacturing process. Although RCI was to retain title to all logs delivered to the mill, no financing statement was filed to perfect RCI's security interest in the logs.

During 1983 and the first half of 1984, RCI supplied logs to Pacific Star under their agreement. In June of 1984 Jones met with Harmon and the American National Bank of Afton. It was agreed that the parties would continue under the log purchase agreement for another year. During this meeting, Jones indicated that he was exploring a new source of credit. The new source was Longtree, Ltd.

Longtree, Ltd. is a limited partnership comprised of Diehl Lumber Products Company and Commodities Corporation. The president and major stockholder of Diehl Lumber Products is Terry Diehl. Longtree's other principal agent in this scenario was Larry Beck, a self-described "trader" working for Commodities Corporation. As described by Mr. Diehl and Mr. Beck, Longtree wanted to contract with Pacific Star for lumber products for the best possible price which they intended to sell approximately one year in the future. Longtree knew that Pacific Star had been experiencing financial problems.

On June 22, 1984, Longtree entered into an agreement with Pacific Star which provided that Longtree would purchase, on a month-to-month basis, all logs delivered to the sawmill but not consumed or converted to lumber during the month. The agreement further provided that Pacific Star would repurchase the logs beginning in February 1985 by providing Longtree with finished lumber. The total value of logs to be purchased was $1,250,000. The agreement contemplated that Longtree's logs would be segregated, and Pacific Star would provide proof of payment to loggers. After the agreement was executed, it was reviewed by R. Dale Potter, counsel for Diehl Lumber, and by Tom Daily, counsel for Commodities Corporation. On July 17, 1984, Pacific Star executed a security agreement granting Longtree a security interest in Pacific Star's log deck. The agreement stated that the security interest was granted to secure the performance by Pacific Star of its obligations under its June 22, 1984 agreement with Longtree.

Pacific Star also executed a financing statement which was filed on August 17, 1984.

After the 1984 Longtree agreement was executed, RCI continued to deliver logs to Pacific Star, and Longtree commenced making payment to Pacific Star. Longtree failed or neglected to demand proof that Pacific Star's loggers were being paid. Initially, the parties attempted to segregate Longtree's logs from Pacific Star's logs, but the mill could not operate under that arrangement. Consequently, the logs were commingled, and Longtree had Pacific Star post notices upon the logs which stated that the logs were owned by Longtree. Harmon, the manager of RCI, saw the notices, became alarmed that someone was claiming ownership of his company's logs, and made inquiry of Mr. Jones. Jones told Harmon that Longtree was aware of his ownership, that Longtree was helping Jones with his finances, and that the notices were a temporary maneuver to satisfy lenders. Harmon accepted this explanation.

In January 1985, Longtree decided to explore a possible acquisition of the Pacific Star sawmill. A meeting between Pacific Star and Longtree was scheduled in January 1985 at O'Hare Airport in Chicago. Jones mailed a packet of materials to Mr. Beck and Mr. Diehl which provided an overview of Star Studs' financial condition. At the meeting, the relationship between Pacific Star and RCI was discussed. Following the meeting, Longtree concluded that Pacific Star was insolvent and that it did not want to purchase the sawmill. Longtree did not tell Darrell Jones that it had decided not to purchase the mill, and Jones continued with the hope and expectation of closing a sale. On January 21, 1985, Longtree offered to take over operation of the mill, but the offer was apparently declined.

Ultimately, Pacific Star failed to perform its obligations under the 1984 Longtree agreement, and on April 22, 1985, Longtree, acting through a wholly-owned subsidiary, Mercedes Timber, Inc., took control of the Afton sawmill. In doing so, Longtree took possession of the unsawed logs as well as some work in progress and finished lumber. Longtree refused to permit RCI to remove any logs, refused to acknowledge that RCI had any interest in the logs, and announced its intention to saw the logs.

On April 23, 1985, RCI filed a complaint alleging that Pacific Star was indebted to it in the amount of $1,104,000 for logs, labor and materials purchased on account, and that RCI was the owner of the logs it had delivered to Pacific Star's sawmill. RCI also petitioned for, and obtained, a writ of attachment covering the logs. On April 24, 1985, RCI agreed to release its attachment covering the logs if a suitable bond were posted. RCI and Longtree then entered a stipulation providing that Longtree would post a bond and would be permitted to saw the logs and, if RCI won the lawsuit, it would be paid the value of the logs from the bond. After the stipulation was entered, the attachment was released, and the logs were sawed by Longtree.

In July 1985, three months after the commencement of RCI's lawsuit, Longtree purchased the notes and associated mortgages and security interests from Star Valley State Bank and the Bank of California. Longtree began foreclosure proceedings and was awarded a decree of foreclosure. Longtree was the sole bidder at a foreclosure sale held on February 20, 1987. The amount that Longtree bid for the property was less than the debt owed to Star Valley State Bank and the Bank of California. None of Pacific Star's other creditors received any funds from the sale.

## THE LONGTREE AGREEMENT

■ The parties agree that by virtue of its title retention contract, RCI became the holder of a security interest in the logs it delivered to Pacific Star.[1] But RCI took no steps to perfect its security interest. An

---

1. Section 34–21–120(a)(xxxvii), W.S.1977, provides in pertinent part:
   "The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (section 2–401 [§ 34–21–246]) is limited in effect to a reservation of a 'security interest.'"

unperfected security interest is subordinate to a perfected security interest in the same collateral. Sections 34–21–930(a)(i) and 34–21–941(e), W.S.1977. An unperfected security interest is superior, however, to the interest of a buyer not in the ordinary course of business who takes with knowledge of the unperfected security interest. Section 34–21–930(a)(iii), W.S.1977.

Longtree asserted a superior right to the logs under three alternative theories. First, it contended that it was a buyer not in the ordinary course of business without knowledge of RCI's unperfected security interest. Second, it contended that it held a perfected security interest in the logs which was superior to RCI's unperfected interest. Third, it argued that it was both a buyer not in the ordinary course of business *and* a secured party.

The district court took the view that Longtree's status under its log purchase agreement with Pacific Star was that of a buyer not in the ordinary course of business. The court concluded that Longtree's security agreement with Pacific Star, which was executed one month after the log purchase agreement, was unenforceable because it was merely an "afterthought of Mr. Daily" which was taken "just in case a Court would rule that the transaction was a loan not a sale." The court found that Longtree had knowledge of RCI's security interest and consequently ruled that RCI had the superior right to the logs.

Longtree now argues that the district court erroneously held that Longtree could not be both a buyer and a secured party.[2]

2. The code indicates that a buyer of goods can also hold an article 9 security interest in those goods. Section 34–21–902(a), W.S.1977, Cum. Supp.1987, states:
"[T]his article applies:
"(i) To any transaction (regardless of its form) which is intended to create a security interest in personal property * * *."
Section 34–21–120(a)(xxxvii), W.S.1977, defines a security interest in the following terms:
" 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation."
The section goes on to provide that a buyer may acquire a security interest in the goods he is buying:

In our view, however, the critical determination made by the district court was a factual one—whether Longtree *intended* to create an article 9 security interest to secure the payment or performance of an obligation.

As we stated in *WYHY Federal Credit Union v. Burchell*, Wyo., 643 P.2d 471, 474 (1982), the principal test for determining whether a transaction is to be treated as a secured transaction is whether the transaction was intended to have effect as security. The record contains undisputed evidence which demonstrates a good deal of ambivalence on the part of Longtree concerning whether the transaction should be structured as a straight purchase of inventory, an article 9 secured financing arrangement, or some combination of the two. The Pacific Star–Longtree agreement describes the transaction as a "log purchase-lumber sale agreement." The agreement contains the following footnote:

"Star Studs agrees to cooperate with Longtree Limited Partnership in Longtree's filing of any appropriate security documents necessary, in Longtree's sole discretion, to perfect its interest in the log deck."

Although the log purchase agreement was executed on June 22, 1984, a security agreement was not executed until July 17, 1984, and a financing statement was not filed until August 17, 1984. On September 8, 1984, R. Dale Potter, attorney for Diehl Lumber Products, wrote a letter to Terry Diehl, Larry Beck, and Darrell Jones in which he stated:

"The special property interest of a buyer of goods on identification of such goods to a contract for sale under section 2–401 [§ 34–21–246] is not a 'security interest,' but a *buyer may also acquire a 'security interest' by complying with article 9*." (Emphasis added.)
Moreover, article 9 makes it clear that the location of title to collateral is immaterial:
"Each provision of this article with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor." Section 34–21–921, W.S.1977.

"I have reviewed the letter agreement dated June 22, 1984, together with the Security Agreement and UCC–1 financing statement you provided. In addition to a review of these documents, I have discussed the purpose, nature, and the specifics of the transactions between Longtree Limited and Pacific Star, Inc. with each of you. My understanding is that Longtree will purchase log deck from Pacific Star and hold it as inventory. The log deck will be processed by Pacific Star for a fee and the product will be held by Longtree Limited for sale and distribution to its customers.

"In my opinion, the transaction as outlined is a purchase of inventory and there is no need for a security agreement nor a financing statement between Pacific Star and Longtree. In fact, you may want to avoid entering into any such Security Agreement in that it may create confusion about the nature of the transaction and give rise to an argument on behalf of the Bank of California that the transaction is actually a loan by Longtree Limited to Pacific Star rather than a purchase of log deck inventory.

"To assure that no such confusion is created, the log deck inventory should be segregated from any log deck belonging to Pacific Star. This could be accomplished by leasing property from Pacific Star and segregating all log deck belonging to Longtree Limited. Accurate accounting records should also be kept to help support the fact that the log deck inventory has been purchased and paid for by Longtree Limited.

"After the log deck has been processed, the product should be segregated and kept separate from any product belonging to Pacific Star. If possible, Longtree Limited should lease premises from Pacific Star for the purpose of storing its products. Accurate accounting records should also be kept to document that Pacific Star is being paid only for processing the inventory and that Pacific Star has no interest in the product. Periodic reconciliations between the accounting records and the log deck and product inventory on hand should be made by

employees or officers of Longtree Limited."

On September 17, Darrell Jones wrote the following reply to Mr. Potter:

"I agree with you that the transaction outlined in the Pacific Star–Longtree letter agreement is a log purchase arrangement and not a loan to or advance on logs of Pacific Star. The only reason we considered the UCC–1 filing and subordination agreement was to help make Longtree's lenders more comfortable with the transaction. However, in the event of a dispute, I concur with you that these documents might confuse the issue of rightful ownership.

"As you requested, a lease is being prepared and all logs belonging to Longtree will be stored on the leased premises."

In his opening statement at trial, Longtree's attorney stated:

"Longtree anticipated that this was nothing more than a purchase of inventory. But to be on the safe side and again knowing the Bank of California had a valid, perfected security interest in logs and in order to protect themselves in case somebody were to find or characterize this log purchase as a security arrangement or financing arrangement, they perfected a security interest, if such there was, by filing a financing statement in the Secretary of State's office in July of 1984."

Near the end of the trial, he told the court:

"As we started out in this case, we—my opening statement was that we originally intended to enter into a log purchase agreement but if it wasn't that, then we had a security interest and we claimed a security interest in those logs."

Larry Beck testified as follows:

"Q. All right. Now Mr. Beck, I'm somewhat curious about this. Do you maintain that your transaction here is what would be construed as a purchase of logs?

"A. Yes, I do.

"Q. You don't maintain it would be a loan or a financing arrangement?

"A. No.

\* \* \* \* \* \*

"Q. So that I've got everything clear now, you are claiming you—you were purchasing the logs, not financing them; is that correct?

"A. That's correct."

Longtree had Pacific Star post signs on the logs which read:

> "LOG DECK
> Owned By
> LONGTREE LIMITED
> Spokane, Washington"

Finally, Tom Daily's testimony indicates that the only reason the parties entered the security agreement was to protect Longtree in case a court "recharacterized" the transaction as a financing arrangement rather than a purchase of inventory:

> "We were also concerned about a subsequent recharacterization of our purchase as it being a financing arrangement and we wanted to make certain that if it, in fact, were recharacterized, that it would be recharacterized as a secure financial arrangement or a secured loan to the extent of trying to get it characterized as a purchase money security and to take priority over even the Bank of California's lien."

In the face of this evidence, Longtree now contends that it should be treated as a "financing buyer" with an article 9 security interest rather than an unsecured buyer not in the ordinary couse of business. A financing buyer is a buyer who "advances money to [a] seller and acquires an interest in the goods to be supplied which secures the supplier's 'alternative' duty either to deliver the goods or repay the advance." (Footnote omitted.) J. White and R. Summers, Uniform Commercial Code § 22–2 at 876 (2nd ed. 1980).

In support of its argument that it was a financing buyer, Longtree cites *In re Bristol Industries Corp.*, 38 U.C.C.Rep.Serv. 989 (Bankr.Ct., D.Conn.1981). In that case, General Motors supplied scrap metal to Bristol, a metals processor which was to convert the metal into bronze strip that was to be sold back to General Motors. General Motors purported to retain title to the scrap metal throughout the conversion process. Bristol owed substantial sums to a secured creditor who held a perfected security interest in Bristol's inventory. Before Bristol could convert the scrap metal supplied by General Motors under the title retention agreement into bronze strip, Bristol became insolvent and filed for bankruptcy. A dispute arose between General Motors and Bristol's secured lender as to which was entitled to the unprocessed scrap metal. The court found that the transaction by which General Motors provided scrap metal to Bristol was a sale and that General Motors' attempted retention of title was limited to the reservation of a security interest in the metal. The court further found that because General Motors failed to file a financing statement, its security interest was subordinate to the perfected security interest held by Bristol's lender. The court noted that General Motors' security interest was intended to secure Bristol's obligation to convert metal under its agreement with General Motors. The court stated:

> "General Motors' relationship with Bristol is that of a financing buyer, that is, 'the buyer who pays in advance to enable his seller to manufacture the very goods for which he has contracted.' Jackson & Cronman, A Plea For The Financing Buyer, 85 Yale L.J. 1, 3 (1975). While General Motors did not advance cash to aid in Bristol's acquisition of the raw material, General Motors did advance the raw material itself, here toll metal, from which Bristol manufactured the finished goods, alloy strip, which General Motors had contracted to purchase from Bristol. The arrangement has aspects of both a security device and a sale, and falls within the filing provisions of Article Nine." Id. at 998.

Longtree contends that it occupies the same position in this case as General Motors in Bristol Industries, except that Longtree filed a financing statement to perfect its security interest.

While we have no quarrel with the financing buyer concept, we conclude that it is not applicable to the facts of this case. Longtree is in a very different position than General Motors in the Bristol Industries case. In Bristol Industries, General Motors supplied the scrap metal to Bristol and the court characterized the transaction as a title retention sale *from General Motors to Bristol*. In the present case, Longtree *bought* the logs from Pacific Star outside Pacific Star's ordinary course of business. In addition, in this case the court found that Longtree bought them with knowledge of RCI's preexisting security interest. Because these facts did not exist in Bristol Industries, the case is distinguishable. We do not think Bristol Industries stands for the proposition that a buyer not in the ordinary course of business who purchases with knowledge of another party's unperfected security interest can improve its position and absolve itself of the effect of its knowledge by executing a security agreement and filing a financing statement, especially when the intent of the parties to create a security interest is doubtful.

The question of whether Longtree's purchase of logs was intended to be an outright purchase of inventory or a secured financing arrangement was a question of fact for the trial court. Even though a security agreement and financing statement were executed, the record contained sufficient evidence for the district court's conclusion that Longtree intended the transaction to be an outright sale and purchase of logs. If Longtree wanted to be treated as a financing buyer, it could easily have structured the transaction to clearly reflect that desire. Moreover, although Longtree now insists that it should not be treated as a buyer not in the ordinary course of business, Longtree itself pursued that theory. A party who advances alternative theories at trial does so at the risk that one of them will be accepted. The trial court did not err in concluding that Longtree should be treated as a buyer not in the ordinary course of business rather than the holder of an enforceable perfected security interest.

## KNOWLEDGE

■ The question of whether Longtree had knowledge of RCI's security interest is a question of fact. Section 34–21–120(a)(xxv)(C) provides that

"[a] person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it."

Knowledge may be proved by circumstantial evidence. See *In re County Green Limited Partnership*, 438 F.Supp. 693, 697 (W.D.Va.1977). When reviewing a trial court's determination of actual knowledge under the U.C.C., the trial court's findings of fact will not be set aside unless clearly erroneous, and "due regard shall be given to the trial court's opportunity to judge the credibility of the witnesses." *Broadway National Bank v. G & L Athletic Supplies, Inc.*, 10 Kan.App.2d 43, 691 P.2d 400, 402 (1984).

The record contains sufficient evidence to support an inference that Longtree had actual knowledge of RCI's security interest. Longtree knew that RCI was virtually the only logger supplying logs to Pacific Star. The quantity of logs supplied and to be supplied by RCI was enormous. Mr. Diehl knew that Pacific Star had experienced financial difficulties in the past. He also knew that Pacific Star had been closed by creditors in 1984. Both Mr. Diehl and Mr. Beck knew that Jones did not have funds to satisfy his obligations to the Bank of California yet logs were still being supplied. Mr. Diehl and Mr. Beck sought to avoid the Bank of California's claim to the logs by structuring its transaction with Pacific Star as a purchase and sale rather than a financing arrangement, which was the same approach used by RCI. Mr. Diehl and Mr. Beck sought to avoid claims by loggers against the winter log deck by requiring that Longtree's logs be kept separate and by requiring loggers' invoices and evidence that previously received logs had been paid for. Finally, Mr. Jones told Jerry Harmon that Longtree was aware of RCI's claim to the logs.

Although Longtree's witnesses denied actual knowledge of RCI's security inter-

est, the trial court found these denials "preposterous" in light of their demonstrated expertise and experience in such affairs. The court observed that

> "Wyoming people may be simple, trusting and generous but under the circumstances described, it is simply beyond belief that even the most gullible country hick would still be supplying logs on an open, unsecured account (or that his banker would let him). Correspondingly, it is beyond belief that these exceedingly intelligent, sophisticated, knowledgeable, successful and somewhat cynical and contemptuous businessmen would believe there would be a logger in this world trusting, gullible, rich or stupid enough to not only allow such an open and unsecured account, but in addition, to keep expanding it."

It has been stated that

> "as a practical matter, the trier of fact may well conclude that where ignorance could not reasonably exist a person did in fact have knowledge in spite of his assertion to the contrary." 1 Anderson, Uniform Commercial Code § 1–201:360, p. 365 (3rd ed.1981).

RCI did not introduce any direct evidence which showed that Longtree had actual, precise knowledge of the title retention arrangement between RCI and Pacific Star. Nevertheless, the circumstantial evidence described above and the trial court's observations concerning the credibility of Longtree's witnesses when they denied knowledge, when viewed in a light most favorable to RCI, are sufficient to support an inference that Longtree had knowledge of RCI's security interest in the logs.

## ADEQUACY OF DESCRIPTION

■ Longtree next contends that RCI did not obtain an enforceable security interest in the logs delivered after March 1984 because it failed to obtain a signed security agreement covering those logs. The 1983 log purchase agreement between RCI and Pacific Star, in which RCI retained title, created a security interest in favor of RCI as a matter of law. Section 34–21–120, supra. The extent of RCI's security inter-

est is determined by the applicable provisions of article 9:

> "This article applies to security interests created by contract including * * * title retention contract." Section 34–21–902(b), W.S.1977, Cum.Supp.1987.

Section 34–21–922(a), W.S.1977, Cum.Supp. 1987, provides:

> "(a) [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:
>
> "(i) The collateral is in the possession of the secured party * * * or the debtor has signed a security agreement which contains a description of the collateral * * *."

The RCI–Pacific Star log purchase agreement described the collateral as follows:

> "RCI shall sell to Pacific Star and Pacific Star shall purchase from RCI, the logs which shall be made available to Pacific Star at its Star Studs Mill pursuant to the Logging Plan, a copy of which is attached hereto and made a part hereof. The parties recognize that the Logging Plan is subject to revision from time to time by RCI, with the reasonable consent of Pacific Star. The logs to be purchased and sold pursuant to the terms of this Agreement shall be delivered to Pacific Star's Star Studs Mill and stored at such location at the Mill site as Pacific Star shall designate from time to time."

The agreement was signed by Darrell Jones for Pacific Star. The logging plan attached to the agreement covered logs to be delivered between May 1983 and March 1984. The logs claimed by RCI in this action were delivered after March 1984. Although these logs were not identified in the 1983–1984 logging plan, they were identified in subsequent revisions.

Longtree asserts that the revisions to the logging plan cannot serve as a description of the collateral because they were not signed by the debtor, Pacific Star. We disagree. In 8 Hawkland, Uniform Commercial Code Series § 9–110:04 (1986), the author states:

> "One question that has arisen is the extent to which more than one document

may qualify as a security agreement, when one document contains the debtor's signature (and perhaps a description of some collateral) and another document contains a description of additional collateral. The majority rule appears to be that so long as the documents express some internal connection with one another, they may be read together for purposes of including the collateral described in the second document within the security agreement's umbrella. This, or even a more liberal application of the statute of frauds function of the security agreement is certainly in keeping with the liberality evidenced by section 9–110. Some courts, however, would probably require more than mere internal consistency or connection, instead demanding that there be a reference within one document to the other." (Footnote omitted.) (See also *WYHY Credit Union v. Burchell*, supra, 643 P.2d 471.)

In this case, the log purchase agreement and the revised logging plan express an internal connection with one another. As a result, the absence of a signature on the revised logging plan does not render RCI's security interest unenforceable. RCI obtained a security agreement signed by the debtor describing the collateral and its security interest.

▪ Longtree next argues that the parol evidence rule bars introduction of the logging plan revisions. This contention is meritless. In discussing the parol evidence rule, Calamari and Perillo state:

"The parol evidence rule has been stated in many ways but the basic notion is that a writing intended by the parties to be a final embodiment of their agreement may not be contradicted by certain kinds of evidence. A writing that is final is at least a partial integration. If the writing is final and also complete, it is a total integration and may not only not be contradicted by the type of evidence in question but may not even be supplemented by consistent (non-contradictory) additional terms. If it is final and incomplete it may be supplemented by consistent additional terms." J. Calamari and J.

Perillo, Law of Contracts § 3–2 at 135–36 (3rd ed.1987).

In the present case, the express language of the contract indicates that it does not purport to be a complete expression of the parties' agreement. The contract expressly contemplates future revisions to the logging plan. These revisions, introduced by RCI at trial, were consistent additional terms to the agreement and were, therefore, admissable.

Finally, Longtree asserts that the parties did not intend that the log purchase agreement would cover logs delivered after March 1984. In support of this assertion, Longtree relies upon deposition testimony of Darrell Jones. RCI has moved to strike any reference to this deposition testimony because it was not offered at trial. See Rule 32(a), W.R.C.P. We need not rule on RCI's motion to strike because, even if the deposition testimony could be relied upon at this stage of the proceedings, it is merely evidence which conflicts with evidence favoring the prevailing party. When reviewing factual findings, this court leaves such evidence out of consideration. *Madrid v. Norton*, Wyo., 596 P.2d 1108, 1117 (1979).

## BANK OF CALIFORNIA SECURITY INTEREST

▪ In 1981, Pacific Star granted the Bank of California a security interest in "[a]ll inventory, raw materials [and] equipment including but not limited to * * * sawmill supplies, work in process and materials used or consumed in Debtor's business, now owned or hereafter acquired * * *." This security interest, which was perfected in 1981, was broad enough to cover the logs delivered to Pacific Star by RCI.

In July 1985, some three months after RCI filed this action, Longtree purchased the underlying debt owed by Pacific Star to the Bank of California and received an assignment of the Bank of California's perfected security interest. In April 1985, the parties had stipulated that Longtree could saw the logs upon posting a surety bond in the amount of $340,000, the estimated val-

ue of the logs. The court entered an order in accordance with this stipulation which provided:

> "If the claim of the Plaintiff, Resource Control International, 'Inc., to the logs is upheld by this Court, the Defendants, Longtree Ltd, Diehl Lumber Company and Mercedes Timber, Inc., will pay to the Plaintiff the value of the logs now in the deck claimed by Resource Control International, Inc."

Longtree now contends that the security interest which it obtained from the Bank of California continued in "any identifiable proceeds" of the collateral under § 34–21–935(b), W.S.1977, Cum.Supp.1987, and that the surety bond constitutes proceeds of the collateral.

Section 34–21–935(a), W.S.1977, Cum. Supp.1987, defines proceeds as follows:

> " 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds."

The district court concluded that the bond posted by Longtree did not fall within this definition. We agree. The bond simply did not comprise something received upon the sale, exchange, collection or other disposition of the logs. Instead, the posting of the bond allowed Longtree to dispose of the logs. Presumably, they sold the logs as lumber and received "proceeds" from those sales.

### FUTURE ADVANCES

■ Longtree next contends that RCI's unperfected security interest is rendered unenforceable by the future advances provision in § 34–21–936(c), W.S.1977, Cum. Supp.1987, which states:

> "A buyer other than a buyer in ordinary course of business (subsection (a) of this section) takes free of a security interest to the extent that it secures future advances made after the secured party acquires knowledge of the purchase, or more than forty-five (45) days after the purchase, whichever first occurs, unless made pursuant to a commitment entered into without knowledge of the purchase

and before the expiration of the forty-five (45) day period."

Longtree argues that RCI's continued sales of logs to Pacific Star on credit constituted future advances, at least a portion of which were made with knowledge of Longtree's purchase and/or more than forty-five days after Longtree's purchase.

While Longtree's argument is perhaps vulnerable on several grounds, we conclude, as did the district court, that RCI's continued delivery of logs to Pacific Star did not constitute future advances under § 34–21–936. Although the U.C.C. does not define the term "future advance," the reason for protecting buyers against future advances is to prevent a secured party from "squeezing out" a buyer who takes subject to a security interest by merely making additional advances to the debtor which enlarge the secured party's security interest in the collateral. See Draftsmen's Statement of Reasons for 1972 Changes in Official Text § 9–312, ¶¶ 2, 5. Thus it has been held that second loans which place an additional burden on collateral should be considered future advances under the section. *Spector United Employees Credit Union v. Smith*, 45 N.C.App. 432, 263 S.E. 2d 319 (1980).

Section 34–21–102, W.S.1977, provides that the Uniform Commercial Code "shall be liberally construed and applied *to promote its underlying purposes and policies*." (Emphasis added.) The official comment to § 1–102 of the U.C.C. states:

> "The text of each section should be read in the light of the purpose and policy of the rule or principle in question * * * and the application of the language should be construed narrowly or broadly, as the case may be, in conformity with the purposes and policies involved."

Longtree was not subjected to the type of unfairness which § 34–21–936(c) was designed to prevent. Each extension of credit was accompanied by a corresponding increase in the collateral. Longtree knew of the credit arrangement before agreeing to purchase the logs, and the continued deliveries of lumber did not increase the burden on the collateral beyond the terms of the

original agreement. The trial court correctly ruled that § 34–21–936(c) did not render RCI's unperfected security interest unenforceable.

## DAMAGES

■ Upon finding that Longtree converted the logs to which RCI had the superior claim, the district court awarded RCI the full value of the logs. Longtree contends that RCI was only entitled to the value of its unperfected security interest in the logs, which was worth considerably less than the logs themselves.

We find no error in the damage award. In *Frantz v. First National Bank & Trust Company of Wyoming*, Wyo., 687 P.2d 1159, 1162 (1984), we said:

"A secured party ordinarily may proceed against the debtor to either collect the debt or to obtain the proceeds from the transfer or maintain an action against the purchaser for repossession of the collateral or an action for conversion. *American East India Corp. v. Ideal Shoe Co.*, 400 F.Supp. 141 (1975). Ordinarily one who acquires by purchase or otherwise is liable in trover or conversion for the value of the property or the amount paid. *South Omaha Production Credit Ass'n v. Tyson's Inc.*, 189 Neb. 702, 204 N.W.2d 806 (1973)."

The trial court applied the correct measure of damages by awarding RCI the value of the logs.

## HEARSAY TESTIMONY

■ Finally, Longtree asserts that the trial court erred in denying its motion to strike the hearsay testimony of Jerry Harmon. The motion to strike was remarkably broad in scope. It included "all of the testimony of Mr. Harmon and other witnesses as it related to any statements made by Mr. Darrell Jones * * *." We conclude that the trial court properly denied the motion to strike because it was untimely. Rule 103, W.R.E., provides:

"(a) *Effect of erroneous ruling.*—Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

"(1) Objection.—In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context * * *."

An objection or motion to strike is timely if made when the grounds for the motion first become apparent. 1 D. Louisell and C. Mueller, Federal Evidence § 8 (1977). Appellant argues that the grounds for objection to the disputed statements did not exist until it was determined that the declarant, Darrell Jones, would not be called as a witness by appellee. In support of this argument, Longtree cites Rule 801(d)(1), W.R.E., which provides:

"A statement is not hearsay if * * * [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony * * *."

In order for a statement to fall within this section, it must be inconsistent with the declarant's testimony at trial. Because Darrell Jones had not testified at trial when the disputed statements were admitted, there was no way of knowing whether the statements were inconsistent with his testimony. At that point they were inadmissible hearsay and subject to a motion to strike. Because the grounds for objection appeared long before the motion to strike was made, the motion was untimely.

Affirmed.