2012 COA 129

**FORMER TCHR, LLC, Plaintiff–Appellant,**

v.

**FIRST HAND MANAGEMENT LLC, Defendant,**

and

**Richard Oneslager, Jr., Daniel P. Genovese, and Balmar Management Group LLC, Defendants–Appellees.**

**Nos. 11CA0990, 11CA1081.**

Colorado Court of Appeals, Div. VI.

Aug. 2, 2012.

Hutchinson Black and Cook, LLC, William D. Meyer, Keith M. Edwards, Boulder, Colorado, for Plaintiff–Appellant.

Blain Myhre LLC, Blain D. Myhre, Englewood, Colorado; Lapin & Lapin, P.C., Theresa L. Corrada, Denver, Colorado, for Defendants–Appellees.

Opinion by Judge GABRIEL.

¶ 1 Plaintiff, Former TCHR, LLC, appeals the trial court's judgment rejecting its fraudulent concealment and misrepresentation claims against defendants Richard Oneslager, Jr. and Daniel P. Genovese and the trial court's midtrial dismissal of Former TCHR's conversion claim against defendant Balmar Management Group LLC. Former TCHR also appeals the district court's grant of attorney fees to Oneslager, Genovese, and Balmar.

¶ 2 We conclude that the trial court did not err in finding that Former TCHR's fraudulent concealment and misrepresentation claims were barred by the economic loss rule. We further conclude, as an apparent matter of first impression in Colorado, that a conversion claim may lie against a defendant who gave value, received delivery, and then sold property with actual knowledge that the plaintiff had an unperfected security interest in that property. Thus, we hold that the

trial court erred in granting Balmar's midtrial motion to dismiss Former TCHR's conversion claim and remand for further proceedings on that claim. Finally, we conclude that we lack jurisdiction to consider Former TCHR's appeal of the attorney fee award because that award is not yet final.

¶ 3 Accordingly, we affirm the judgment in favor of defendants Oneslager and Genovese on the fraudulent concealment and misrepresentation claims, reverse the dismissal of Former TCHR's conversion claim against Balmar and remand for a new trial on that claim, and dismiss without prejudice Former TCHR's appeal of the fee award to Oneslager, Genovese, and Balmar.

## I. Background

¶ 4 Through a predecessor in interest, Former TCHR, whose sole member was attorney and sophisticated real estate investor Samuel Brown, signed a Real Estate Sale Agreement with Town Center Investors, LLC (TCI) to purchase a shopping center from TCI. TCI was owned by Oneslager, and Genovese was the shopping center's property manager.

¶ 5 The Sale Agreement required that TCI provide Former TCHR with certain due diligence materials within ten business days after the execution of the Agreement. These materials included the leases and rent roll applicable to the property; any contracts affecting the property; environmental, mechanical, structural, soils, and other reports or evaluations concerning the property; rental and operational expense records for the prior twelve months; and the most recent survey of the property. In addition, the Agreement gave Former TCHR extensive investigation rights and allowed it to terminate the Agreement on or before the expiration of a defined investigation period if it was not satisfied with the results of its investigation and testing.

¶ 6 The Agreement also contained a lengthy "as is" clause, which stated, in all capital letters:

> [E]xcept as provided expressly herein and in the closing documents, neither Seller nor anyone acting for or on behalf of Seller, has made any representation, warranty, statement or promise to Buyer concerning the real estate, the quality, value, physical aspects or condition thereof, ... the current or projected income or expenses of the real estate, or any other matter with respect to the real estate; that entering into this agreement, Buyer expressly releases Seller from all such matters and acknowledges that it is relying solely on its own investigation and has not relied upon any representation, statement or warranty of Seller or anyone acting for or on behalf of Seller, other than as expressly contained in this agreement or the closing documents and is thereby purchasing the real estate as is; and that Buyer does hereby waive and Seller does hereby disclaim all warranties of any kind or type whatsoever with respect to the real estate, whether expressed or implied.... Buyer has not relied and will not rely on, and Seller is not liable for or bound by, any express or implied warranties, guaranties, statements, representations or information pertaining to the property or relating thereto made or furnished by Seller, property manager, Broker, or any real estate broker or agent representing or purporting to represent Seller, to whomever made or given, directly or indirectly, verbally or in writing, unless specifically set forth herein, and Buyer expressly holds Seller harmless in relation to such matters.

¶ 7 The shopping center's anchor tenant, Willary Town Center LLC, operated a gas station and convenience store on the premises. Balmar, which was also owned by Oneslager and which employed Genovese, supplied fuel to Willary.

¶ 8 After TCI and Former TCHR signed the Sale Agreement but before the closing, Former TCHR received information that Willary had lost money in the prior year and that, on occasion, it was late in paying rent to TCI. Former TCHR then entered into a "side letter" with defendant First Hand Management, LLC, another company that Oneslager owned. Under this side letter, if Willary defaulted on its lease during the first twenty-four months after the date of the letter, Former TCHR could exercise a "Replacement Option" and require First Hand,

among other things, to assume Willary's lease and operate the gas station and convenience store in Willary's stead.

¶ 9 Former TCHR subsequently closed on the shopping center and assumed TCI's lease with Willary. As pertinent here, that lease provided:

> In addition to the statutory landlord's lien, Landlord [Former TCHR] shall have at all times a valid security interest to secure payment of all rentals and other sums of money becoming due under the Lease from Tenant, ... upon all goods, wares, equipment, fixtures, furniture, improvements, and other personal property of Tenant presently, or which may hereafter be, situated on the Premises, and all proceeds therefrom. Such property shall not be removed without the consent of Landlord until all arrearages ... shall first have been paid and discharged.

The Willary lease also provided that upon the event of a default by Willary, Former TCHR could, on reasonable notice, enter the premises, take possession of any of Willary's property situated thereon, and sell such property at a public or private sale.

¶ 10 Soon after Former TCHR closed on the shopping center, Willary defaulted on its lease. Thereafter, Former TCHR served a demand for payment of rent or possession on Willary. Willary subsequently vacated the premises, leaving behind convenience store and fuel inventory. Former TCHR then chose to exercise the Replacement Option, and pursuant to that agreement, First Hand assumed Willary's lease obligation and took over the operation of the gas station and convenience store.

¶ 11 Upon its departure from the premises, Willary, through counsel, wrote to Former TCHR and offered to turn over the lease and its then-existing convenience store and fuel inventory to First Hand, provided that Former TCHR release Willary from the lease and pay it fair compensation or give it a credit against its rent deficiency for the inventory. We have seen no indication in the record as to whether Former TCHR responded to this offer. The record, however, reflects that Willary, which had also incurred a substantial debt to Balmar for fuel, con-structively transferred the inventory to Balmar in exchange for a reduction in Willary's debt to Balmar. Balmar then sold the inventory to its sister company, First Hand (both Balmar and First Hand were owned by Oneslager), for sale to First Hand's customers.

¶ 12 Former TCHR subsequently sued, among others, Oneslager, Genovese, and Balmar. As pertinent here, Former TCHR alleged that after the Sale Agreement was signed but before closing, Oneslager and Genovese had (1) fraudulently misrepresented the shopping center's revenues and (2) fraudulently concealed facts concerning Willary's financial strength, including its substantial outstanding debt to Balmar. Former TCHR further alleged that Balmar had converted the Willary inventory.

¶ 13 The case proceeded to a trial to the court. At the conclusion of Former TCHR's case-in-chief, defendants moved for dismissal pursuant to C.R.C.P. 41(b)(1). As pertinent here, Balmar argued that Former TCHR's conversion claim failed because, although Former TCHR had a security interest in Willary's inventory, it did not commence a C.R.C.P. 120 proceeding and took no other steps to protect its interest. Thus, Balmar contended that Former TCHR did not possess or have any ownership interest in the inventory.

¶ 14 Former TCHR responded that the Willary lease gave it a security interest in the inventory and that Balmar was well aware of the lease and its provisions, given that Balmar's owner, Oneslager, also owned TCI and First Hand. Former TCHR further noted that it had given defendants written notice of its security interest, and it argued that its rights were superior to those of either First Hand or Balmar. Nonetheless, Balmar took the inventory, even though in Former TCHR's view, it had no right to it, and then sold it to First Hand. Former TCHR also disagreed with Balmar's contention that Former TCHR was required to commence a C.R.C.P. 120 proceeding to preserve its security interest in the inventory.

¶ 15 The trial court granted defendants' motion as to Former TCHR's conversion claim against Balmar but denied the motion

in all other respects. As to the conversion claim, the court stated:

> I do not find that the Plaintiffs have submitted sufficient evidence to establish by a preponderance that Balmar did anything but grant Willary a credit, which doesn't do anything against this Plaintiff's interest, or that they asserted an interest, but nothing that would have actually damaged the Plaintiff. [sic]

¶ 16 Trial proceeded on the remaining claims, and the court ultimately issued its findings of fact, conclusions of law and judgment. As pertinent here, the court ruled against Former TCHR on its fraudulent misrepresentation and concealment claims, holding that some of the alleged misrepresentations were never made by Oneslager or Genovese, some of their statements were true when made, some were mere statements of opinion, and none were fraudulent. The court further found no justifiable reliance by Former TCHR, due to the Sale Agreement's disclaimers and Former TCHR's investigation rights, and no damages. And the court found that Former TCHR's fraud-based claims were barred by the economic loss rule.

¶ 17 In addition, notwithstanding that it had previously dismissed Former TCHR's conversion claim, the court again addressed that claim, this time finding that Willary had a right to the inventory and chose to allow First Hand to apply the value of the inventory to reduce Willary's liability to Balmar. The court further found that Former TCHR did not have possession or an immediate right to the Willary inventory, apparently agreeing with Balmar's midtrial argument that Former TCHR had failed sufficiently to protect its security interest in the inventory.

¶ 18 In a later order, the court awarded attorney fees to Oneslager, Genovese, and Balmar, although the court did not reduce this award to a sum certain.

¶ 19 Former TCHR now appeals.

## II. Fraudulent Misrepresentation and Concealment Claims

¶ 20 Former TCHR contends that the trial court erred on numerous grounds in entering judgment for Oneslager and Genovese on the fraudulent misrepresentation and concealment claims. We need not address all of Former TCHR's arguments, however, because we conclude that the trial court correctly held that Former TCHR's fraudulent misrepresentation and concealment claims were barred by the economic loss rule.

### A. Applicable Law

¶ 21 "Whether the economic loss rule precludes a particular claim raises a legal issue subject to de novo appellate review." *Makoto USA, Inc. v. Russell,* 250 P.3d 625, 627 (Colo.App.2009).

¶ 22 The economic loss rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Constr., Inc.,* 10 P.3d 1256, 1264 (Colo.2000). The purposes of this rule are to maintain a distinction between tort and contract law, enforce parties' expectancy interests so that they can reliably allocate risks and costs during their bargaining, and encourage parties to build any cost considerations into their contracts. *BRW, Inc. v. Dufficy & Sons, Inc.,* 99 P.3d 66, 72 (Colo. 2004).

¶ 23 Our supreme court has identified three factors that aid in determining whether an allegedly violated tort duty arose independently of the parties' contract: (1) whether the relief sought in tort is the same as the contractual relief; (2) whether there is a recognized common law duty of care in tort; and (3) whether the tort duty differs in any way from the contractual duty. *Id.* at 74; *see also Makoto,* 250 P.3d at 627 (noting that to show that an independent duty of care exists under tort law, two conditions must be satisfied: (1) the duty must arise from a source other than the relevant contract, and (2) that duty must not be a duty also imposed by the contract).

¶ 24 When a tort duty is memorialized in a contract, "it follows that the plaintiff has not shown any duty independent of the [contract] and the economic loss rule bars the

tort claim and holds the parties to the [contract's] terms." *BRW*, 99 P.3d at 74. Moreover, a claim for fraudulent misrepresentation or concealment in connection with the performance of a contract does not necessarily arise independently of the duties set forth in the contract. *See Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 291 (Colo.App.2009). For example, claims for fraudulent misrepresentation and concealment may be barred if they arise from duties implicated by the contract and relate to the performance of that contract. *See id.* at 292–93.

¶ 25 When the economic loss rule bars a claim against a corporate entity, it may also bar claims against that entity's officers and directors, even if the officers and directors were not parties to the contract at issue. *See Parr v. Triple L & J Corp.*, 107 P.3d 1104, 1108 (Colo.App.2004). For example, such claims may be precluded when the officers' and directors' duties, rights, obligations, or liabilities arise from the contract between the corporate entity and another. *See id.*

### B. Application

¶ 26 Here, the trial court found that Oneslager, as principal of TCI, and Genovese, as the property manager for TCI, were acting as TCI's agents in the matters at issue here. Former TCHR does not appear to dispute these findings, and the record supports them. Accordingly, under the circumstances presented here, if the economic loss rule would bar Former TCHR from bringing fraudulent misrepresentation and concealment claims against TCI, then it would also bar Former TCHR from bringing such claims against Oneslager and Genovese. *See id.*

¶ 27 At trial, Former TCHR asserted that after the Sale Agreement was signed but before the closing, Oneslager and Genovese fraudulently concealed the facts that Willary was substantially indebted to Balmar and was consistently behind in its rent payments to TCI. Former TCHR further alleged that Oneslager and Genovese had fraudulently misrepresented the shopping center's revenues. Former TCHR claimed that by concealing and misrepresenting such facts, Oneslager and Genovese breached their common law duties to refrain from fraud and to disclose material facts that in equity or good conscience should have been disclosed.

¶ 28 In the Sale Agreement, however, Former TCHR and TCI expressly detailed TCI's applicable disclosure duties. For example, as noted above, the Agreement stated that TCI would deliver due diligence materials to Former TCHR within ten business days of signing the agreement, including the leases and rent roll applicable to the property; any contracts affecting the property; environmental, mechanical, structural, soils, and other reports or evaluations concerning the property; rental and operational expense records for the prior twelve months; and the most recent survey of the property. In addition, in the lengthy and extremely broad "as is" clause quoted above, Former TCHR released TCI from any representations regarding the property and confirmed that Former TCHR was relying solely on its own investigation and not in any way on any representations made by TCI regarding the property.

¶ 29 Accordingly, the disclosure duties that Former TCHR now asserts that Oneslager and Genovese breached after the Sale Agreement was signed arose from and were expressly described by that Agreement, or were subsumed within that Agreement's implied covenant of good faith and fair dealing. *See Hamon*, 229 P.3d at 293–94 (rejecting the plaintiff's contention that the implied covenant of good faith and fair dealing cannot, as a matter of law, subsume a claim for fraud in the performance of a contract, and noting that the tort duty alleged by the plaintiff in that case did not differ in any way from the contract duties). Indeed, absent the contractual relationship here, Oneslager and Genovese would have owed no such disclosure duties to Former TCHR. *Id.* at 294 (noting that the economic loss rule barred the plaintiff's fraud claims because any duty to refrain from committing the fraud at issue existed only because of the parties' contracts).

¶ 30 Moreover, it is important to note that the alleged fraud complained of in this appeal occurred during the performance of the Sale

Agreement, "by which time the parties had bargained for the allocation of risks, duties, and remedies." *BRW,* 99 P.3d at 75. Like the plaintiff in *BRW,* however, Former TCHR failed to protect itself from economic loss arising from Oneslager's and Genovese's alleged post-contractual fraudulent misrepresentations and concealment, and the Sale Agreement's terms are controlling. *Id.* To hold otherwise would allow Former TCHR to avoid the carefully and expressly drawn allocations of risks, duties, and remedies for which it bargained when it signed the Sale Agreement. *See id.* It also would allow Former TCHR to evade its express agreement that it would not in any way rely on any representations or information provided by TCI or its representatives, other than those set forth in the Agreement, but rather would rely exclusively on its own investigation. We decline to endorse such an end run around the Agreement's express terms.

¶ 31 *Hamon* is instructive here. In *Hamon,* 229 P.3d at 287, a contractor sued a city, a project administrator, and an engineer for, among other things, fraudulent concealment and misrepresentation. The contractor alleged that the defendants had concealed the fact that the project's drainage design was inadequate and misrepresented that project delays were caused by weather and improper grading, when such delays were actually caused by drainage design flaws. *Id.* at 287–88. The contracts between the contractor and the defendants, however, set forth the defendants' duties of care and also contained the implied covenant of good faith and fair dealing that, under Colorado law, is implied in every contract. *Id.* at 292–93. Moreover, the defendants had impliedly warranted the adequacy of the plans and specifications. *Id.* at 293.

¶ 32 In these circumstances, the division held that the contractor's fraud claims were barred by the economic loss rule because (1) the contractor alleged only economic losses; (2) although there is a common law duty to refrain from fraud, any such duty existed in the case only because of the parties' contracts; and (3) the tort duty alleged by the contractor did not differ in any way from the contract duty, including the implied covenant

of good faith and fair dealing. *Id.* at 293–94. Thus, the contractor failed to demonstrate that the defendants had violated any tort duty independent of the defendants' contractual duties. *Id.* at 294.

¶ 33 Here, as in *Hamon,* (1) Former TCHR alleged only economic losses; (2) although there is a common law duty to refrain from fraudulent misrepresentation and concealment, any such duty existed here solely because of the Sale Agreement; and (3) the tort duties that Former TCHR invokes were imposed by the Sale Agreement and do not differ from the contract duties, including the implied covenant of good faith and fair dealing. Accordingly, for the same reasons set forth in *Hamon,* we conclude that the economic loss rule bars Former TCHR's fraud-based claims here.

¶ 34 In so holding, we reject Former TCHR's assertion, based on section 551(2)(b) of the Restatement (Second) of Torts (1977), that Oneslager and Genovese had an independent common law duty to disclose anything that they knew was necessary to prevent their "partial or ambiguous statement of the facts from being misleading." As noted above, the *Hamon* division rejected the argument that common law duties to refrain from fraud necessarily arise from duties independent of the contract. *See Hamon,* 229 P.3d at 291.

### III. Conversion Claim

¶ 35 Former TCHR next contends that the trial court erred in dismissing its conversion claim against Balmar, pursuant to C.R.C.P. 41(b)(1). We agree.

### A. Applicable Law

¶ 36 Under C.R.C.P. 41(b)(1), a defendant may move for dismissal of a plaintiff's claim in a trial to the court after the plaintiff has completed the presentation of its evidence. The standard for dismissal "is whether judgment in favor of the defendant is justified on the evidence presented, not whether the plaintiff established a prima facie case. Thus, the trial court sitting as trier of fact may determine the facts and render judgment against the plaintiff." *Am. Guar. & Liab. Ins. Co. v. King,* 97 P.3d 161, 165

(Colo.App.2003) (citation omitted). If reasonable minds could differ over the inferences and conclusions to be drawn from the plaintiff's evidence, then we cannot disturb the trial court's findings and conclusions. *Colorado Coffee Bean, LLC v. Peaberry Coffee Inc.*, 251 P.3d 9, 25 (Colo.App.2010).

¶ 37 We review a trial court's factual findings for clear error, and its conclusions of law de novo. *See 17 West Mill St., LLC v. Smith,* (*cert. granted* 2012 WL 2236661 (June 18, 2012)).

¶ 38 Conversion is "any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another." *Stauffer v. Stegemann*, 165 P.3d 713, 717 (Colo.App.2006). As pertinent here, a secured party may bring a claim for conversion against a party who wrongfully obtained and sold property in which the secured party has a security interest, if the secured party's interest has priority over the seller's interest. *See Guy Martin Buick, Inc. v. Colorado Springs Nat'l Bank*, 32 Colo.App. 235, 240, 511 P.2d 912, 914 (1973) (holding that a bank could recover for conversion against a car dealership that had sold certain cars in which the bank had a security interest, because the bank's unperfected security interest took priority over any interest of the dealership), *aff'd*, 184 Colo. 166, 519 P.2d 354 (1974); *Longtree, Ltd. v. Resource Control Int'l, Inc.*, 755 P.2d 195, 198–99, 202 (Wyo.1988) (upholding a determination that the defendant had converted the plaintiff's collateral, where the plaintiff had an unperfected security interest in the collateral and the defendant took the collateral with knowledge of the plaintiff's security interest); *see also* § 4–9–315 official cmt. 2, C.R.S.2011 (noting that a security interest generally survives disposition of the collateral and that when collateral is improperly transferred, a secured party may, in appropriate cases, maintain an action for conversion).

¶ 39 A party has a security interest in property when, among other things, (1) value has been given, (2) the property owner has rights in the property or the power to transfer rights in it to a secured party, and (3) the property owner has signed a security agreement that describes the property. § 4–9–203(b), C.R.S.2011. A security interest can be perfected or unperfected. A perfected security interest is one that complies with the statutory requirements for achieving priority over a trustee in bankruptcy and unperfected interests. *Black's Law Dictionary* 1478 (2009). An unperfected security interest is one held by a creditor who has not established priority over any other creditor but has priority over the debtor. *Id.*

¶ 40 As pertinent here, a buyer, other than a secured party, of goods takes free of another's unperfected security interest in the property (and thus has priority over the other's interest) if the buyer gives value and receives delivery of the property without knowledge of the security interest. § 4–9–317(b), C.R.S.2011. Conversely, if the buyer was aware of the unperfected security interest at the time of the purchase, then the secured party's interest has priority over the buyer's interest. *See Longtree*, 755 P.2d at 199.

### B. Application

¶ 41 Here, the parties agreed in the trial court that Former TCHR had a security interest in the Willary inventory, and notwithstanding Balmar's contrary contention on appeal, the record supports the parties' prior agreement. Specifically, evidence in the record tends to show that Former TCHR gave value to Willary (the use of the store premises) in exchange for a security interest in Willary's inventory; Willary had the power to transfer the inventory; and Willary signed a security agreement (contained within its lease) that described the inventory, which was pledged as collateral. Accordingly, we conclude that the Willary lease gave Former TCHR a valid security interest in the Willary inventory. *See* § 4–9–203, C.R.S.2011.

¶ 42 Former TCHR appears to concede that its security interest was unperfected. Thus, as set forth above, to determine whether Former TCHR has a viable conversion claim against Balmar for obtaining and then selling the inventory, we must decide

whether Former TCHR's interest in the inventory had priority over any interest that Balmar may have had. This, in turn, requires us to determine whether Former TCHR established that Balmar gave value and received delivery of the Willary inventory with knowledge of Former TCHR's security interest in that inventory. *See* § 4–9–317(b). We address each of these elements in turn.

¶ 43 First, at trial, Former TCHR introduced evidence tending to show that Balmar gave value for the Willary inventory and at least constructively received delivery of it. Specifically, the evidence showed that Balmar credited the value of the inventory against Willary's outstanding debt to Balmar and then sold the inventory to First Hand, which could not have occurred had Balmar not received at least constructive delivery of the inventory.

¶ 44 Second, Former TCHR introduced evidence that Balmar was aware of Former TCHR's security interest in the property when it took the inventory. Specifically, Former TCHR introduced evidence to show that Balmar, through its representatives, was aware of the Willary lease and its contents. Former TCHR also introduced e-mail correspondence from it to Balmar representatives, in which Former TCHR asserted that it had a security interest in all of Willary's inventory and thus demanded that Balmar's representatives deliver to Former TCHR the proceeds of any items left at the store and gas station.

¶ 45 On these facts, we conclude that the trial court erred in dismissing Former TCHR's conversion claim on the basis of (1) the court's initial finding that Balmar did nothing but give a credit toward Willary's outstanding balance and (2) the court's subsequent finding that Former TCHR did not have possession of or an immediate right to the Willary inventory.

¶ 46 As to the court's initial finding, as noted above, the evidence tended to show that the credit was given in exchange for the right to the inventory. Such evidence supports Former TCHR's argument at trial that Balmar gave value and took possession of the inventory, notwithstanding Former TCHR's known security interest.

¶ 47 As to the court's subsequent finding, the court appears to have proceeded on the basis of the erroneous assumption, which Balmar had asserted during trial, that, as a matter of law, Former TCHR's failure to perfect its security interest precluded any claim that it had either possession of or an immediate right to the Willary inventory. For the reasons set forth above, this premise was incorrect. Specifically, section 4–9–317(b) and case law make clear that if a buyer was aware of a secured party's unperfected security interest at the time of its purchase, then the secured party's interest has priority over the buyer's interest. *See Longtree,* 755 P.2d at 199. Moreover, Former TCHR produced sufficient, and at this point largely unrebutted, evidence to show that it had a valid unperfected security interest in the Willary inventory, that its interest in that inventory had priority over any interest that Balmar might have had, and that Balmar took and then sold the inventory to First Hand with knowledge of Former TCHR's security interest.

¶ 48 *United States v. Handy & Harman,* 750 F.2d 777 (9th Cir.1984), is instructive here. There, the defendant obtained certain inventory in which the plaintiff had an unperfected security interest. *Id.* at 780. In exchange, the defendant credited the value of the inventory against the transferor's outstanding debt to the defendant. *Id.* It did not, however, give new value. *Id.* On these facts, the Ninth Circuit held that the plaintiff could potentially establish a right to the return of the inventory, or to recover the value of the inventory, from the defendant, although fact questions remained as to whether the defendant had given value and taken delivery without knowledge of the plaintiff's security interest. *Id.* at 785. The court thus remanded the case for findings on those factual issues. *Id.*

¶ 49 Here, as in *Handy & Harman,* Former TCHR presented substantial, and to this point largely unrebutted, evidence that it had an unperfected security interest in the Willary inventory, that Balmar acquired the inventory in exchange for a reduction of Wil-

lary's debt, and that Balmar obtained (and, in the present case, then sold) the inventory with knowledge of Former TCHR's security interest. In our view, such facts sufficiently established a claim for conversion, subject to the trial court's resolving any factual issues once Balmar is given the opportunity to present its evidence. *See also May v. G.M.B., Inc.*, 105 Nev. 446, 778 P.2d 424, 428 (1989) (holding that a buyer was not entitled to summary judgment on the plaintiff's action for unlawfully transferring certain collateral, because the evidence showed that the buyer took possession with knowledge of the plaintiff's security interest); *Longtree*, 755 P.2d at 198–99, 202 (concluding, on facts similar to those present here, that the defendant had converted the plaintiff's collateral); *cf. Am. Gooseneck, Inc. v. Watts Trucking Service, Inc.*, 159 F.3d 1355, 1998 WL 698937, at *6 (5th Cir.1998) (unpublished opinion) (overturning a judgment of conversion where the transferee of collateral had not known that the plaintiff had an unperfected security interest in that collateral); *Arcadia Upholstering, Inc. v. 165 Restaurant, Inc.*, 163 Ill. App.3d 129, 114 Ill.Dec. 368, 516 N.E.2d 523, 526 (1987) (rejecting the plaintiff's conversion claim where the plaintiff had failed to demonstrate that the buyer was aware of the plaintiff's security interest); *Chase Manhattan Bank v. J & L Gen. Contractors, Inc.*, 832 S.W.2d 204, 212 (Tex.App.1992) (same).

¶ 50 For these reasons, we hold that the trial court erred in dismissing Former TCHR's claim for conversion pursuant to C.R.C.P. 41(b)(1). *See Am. Guar. & Liab. Co.*, 97 P.3d at 165.

¶ 51 In so holding, we reject Balmar's assertion that Former TCHR suffered no loss as a matter of law, because it had a security interest in First Hand's after-acquired inventory. Balmar cites no law or evidence in support of this argument, nor does it develop its position in anything other than a conclusory way. Accordingly, we will not consider this contention. *See Barnett v. Elite Props. of America, Inc.*, 252 P.3d 14, 19 (Colo.App.2010) ("We will not consider a bald legal proposition presented without argument or development."); *Castillo v. Koppes–Conway*, 148 P.3d 289, 291 (Colo.App.2006) (re-

fusing to consider a plaintiff's arguments when the plaintiff failed to cite relevant legal authority or identify specific errors).

¶ 52 Having thus determined that the trial court erred in dismissing Former TCHR's conversion claim at the conclusion of Former TCHR's case-in-chief, we must decide the appropriate remedy. For several reasons, we conclude that a reversal for a new trial on the conversion claim is necessary.

¶ 53 First, the trial court made no factual findings regarding Balmar's knowledge of Former TCHR's security interest or Former TCHR's priority, either during trial or in its post-trial findings of fact.

¶ 54 Second, Balmar suggested that it may have had its own security interest in Willary's fuel inventory, which could affect the priorities among the parties.

¶ 55 Third, as noted above, Balmar suggested that Former TCHR suffered no injury because it had a security interest in First Hand's after-acquired inventory. If true, this fact could affect the viability of any conversion claim.

¶ 56 Finally, because the trial court dismissed Former TCHR's conversion claim at the conclusion of its case-in-chief, Balmar had no opportunity to present evidence on this issue.

¶ 57 For these reasons, we reverse the court's order of dismissal and remand for a new trial on Former TCHR's conversion claim. We leave to the trial court's discretion the form that the new trial should take, including the determination as to whether the court will allow Former TCHR to introduce additional evidence, or whether the court will accept the evidence that Former TCHR previously introduced and begin by allowing Balmar to present its evidence, followed by any rebuttal evidence from Former TCHR. *See Conrad v. City & Cnty. of Denver*, 656 P.2d 662, 678 (Colo.1982) (reversing the dismissal of plaintiffs' claims pursuant to C.R.C.P. 41(b)(1) and authorizing the trial court, in its discretion, to permit the plaintiffs to reopen their case and present further evidence in light of the additional guidance on applicable legal principles contained in the court's opinion).

### IV.  Attorney Fees

¶ 58  Finally, Former TCHR argues that the trial court erred in awarding attorney fees to Oneslager, Genovese, and Balmar. Because that award has not yet been reduced to a sum certain, however, we do not have jurisdiction to review it. *See Axtell v. Park Sch. Dist. No. R–3*, 962 P.2d 319, 322 (Colo. App.1998).

### V.  Conclusion

¶ 59  For these reasons, that portion of Former TCHR's appeal relating to the award of attorney fees is dismissed without prejudice, the judgment on Former TCHR's conversion claim is reversed and the case is remanded for a new trial on that claim, and the judgment is affirmed in all other respects.

BERNARD and PLANK *, JJ., concur.