**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-50969
Summary Calendar
_____


AMERICAN GOOSENECK, INC.,
d/b/a AG PRODUCTS,

Plaintiff-Appellant-
Cross-Appellee,

VERSUS

WATTS TRUCKING SERVICE, INC.,
and
MEL KEMP,

Defendants-Appellees-
Cross-Appellants.

_____

Appeals from the United States District Court
for the Western District of Texas
(SA-96-CV-181)
_____

September 16, 1998

Before JOLLY, SMITH, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]


American Gooseneck, Inc., doing business as AG Products
("Gooseneck"), sued Watts Trucking Services, Inc. ("Watts
Trucking"), and Mel Kemp for conversion.  Gooseneck claimed that
Watts Trucking and Kemp had purchased front load containers, or

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion
should not be published and is not precedent except under the limited
circumstances set forth in 5TH CIR. R. 47.5.4.

"dumpsters," on which Gooseneck held a valid and enforceable lien. Watts Trucking then distributed the dumpsters throughout the country, and the containers cannot be identified or returned. The district court held for Gooseneck on its conversion claim and awarded $28,500, the amount the court determined to be the fair market value of the dumpsters at the time and place of conversion.

Gooseneck has appealed, however, claiming that it should also have received the value of the lost use of the containers during their period of detention as well as exemplary damages and pre- and post-judgment interest. Defendants cross-appealed, asserting that Gooseneck's lien was invalid, that Gooseneck's claim to the dumpsters was thus subordinate to that of Watts Trucking under the law of secured transactions, and that Gooseneck therefore had failed to establish conversion. We reverse the finding of liability, thus mooting the damages issue, and we render judgment in favor of defendants.

I.

Gooseneck, an Arizona corporation, buys, sells, and leases trash containers. In April 1993, Mid Western Waste, Inc. ("Mid Western"), a company owned by James Covington, leased 279 eight-yard front load dumpsters and six six-yard dumpsters from Gooseneck. Mid Western subsequently defaulted on the lease.

Gooseneck and Mid Western then agreed that Mid Western would actually purchase the dumpsters, on an installment basis, with the dumpsters serving as security. In August 1993, Gooseneck filed

2

with the Texas Secretary of State a UCC-1 statement describing the type of containers held as security. The UCC-1 form, however, did not include the signature of Covington (for the debtor, Mid Western) as required by the Texas UCC. *See* TEX. BUS. & COM. CODE ANN.§ 9.402(a) (Tex. UCC) (Vernon 1994).

On November 3, 1993, Covington and James Watts entered an agreement for Watts Trucking to purchase the 285 containers from Mid Western for $20,500. Watts is the sole shareholder of both Watts Trucking and a separate company, Texas Waste Systems, Inc. ("Texas Waste"). Kemp worked for Watts as general manager of Texas Waste. Under the agreement between Watts and Covington, Watts Trucking was to take the dumpsters in exchange for two cashier's checks and satisfaction of a debt owed by Mid Western.

Watts directed Kemp, Texas Waste's manager, to issue the checks to Mid Western, and the checks Kemp gave Mid Western showed Texas Waste as the purchaser of the checks. Kemp was acting, however, solely on behalf of Watts and Watts Trucking, not Texas Waste. Watts Trucking was to reimburse Texas Waste for the expenditure.

In late November and early December 1993, Kemp began to take possession of the containers for Watts Trucking. The containers were initially stored in Texas Waste's yard, where Greg Hambicki, a Gooseneck sales representative, observed them in March 1994. Hambicki then told Kemp he thought the containers belonged to Gooseneck. Kemp told Hambicki he had bought the containers and that Hambicki would have to talk to someone else in the company

3

about the claim.  Thereafter, Kemp, at Watts's instruction, began shipping the containers to various parts of the country.

## II.

Apparently unaware that it was Watts Trucking, not Texas Waste, that had purchased the dumpsters, Gooseneck filed suit in state court to enforce its lien against Texas Waste.  In March 1996, the state court entered a judgment finding that Gooseneck held an enforceable lien on the containers as against Texas Waste.

During the state trial, Gooseneck learned for the first time that Kemp had been acting for Watts Trucking, not Texas Waste, in purchasing, acquiring, and distributing the containers, and in February 1996, Gooseneck sued Watts Trucking and Kemp in state court.  Watts Trucking removed the case to federal court on the basis of diversity of citizenship.  Relying on the state court's determination that Gooseneck had a valid lien on the dumpsters, the federal district court held for Gooseneck on its conversion claim and awarded it $28,500, the amount the court determined to be the fair market value of the dumpsters at the time and place of conversion.

## III.

Because we agree with defendants that the court erred in finding conversionSSa conclusion that renders moot Gooseneck's claims concerning the inadequacy of the district court's remedySSwe first address the cross-appeal.  Defendants note that the UCC-1 financing statement Gooseneck filed with the Secretary of State and

4

exhibited at trial lacked the debtor's signature and is thus invalid under Texas secured transactions law. *See* TEX. BUS. & COM. CODE ANN. § 9.402(a)(Vernon 1994). They argue that because the lack of the debtor's signature rendered AG's security interest imperfectSSa point the district court madeSSpriority of claims to the dumpsters depends on § 9.301, the commercial code provision governing the rights of "buyers who take priority over unperfected security interests." TEX. BUS. & COM. CODE ANN. § 9.301 (Vernon 1994). As it applies here, § 9.301(a)(3) provides that

> an unperfected security interest is subordinate to the rights of . . . in the case of goods, . . . a person who is not a secured party and who is a transferee in bulk or other buyer not in the ordinary course of business, . . . to the extent that he gives value and receives delivery of the collateral without knowledge of the security interest and before it is perfected.

The district court failed to apply § 9.301(a)(3).

Defendants argue that all the statutory elements of this provision are satisfied, and that Gooseneck's security interest in the dumpsters was thus subordinate to Watts Trucking's interest. They contend that (1) Gooseneck held an unperfected security interest in the dumpsters, (2) Watts Trucking bought the dumpsters not in the ordinary course of business, (3) Watts Trucking gave value for the dumpsters, and (4) Watts Trucking received delivery without knowledge of the unperfected security interest.

If all these assertions are correct, Gooseneck's security interest was subordinate to Watts Trucking's rights. Watts Trucking thus could not have engaged in conversion, which requires "the wrongful exercise of dominion and control over another's

5

property in denial of or inconsistent with his rights." *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997).

Defendants' analysis is correct. The record establishes, and the district court found, that Gooseneck's security interest was unperfected and, consequently, is subordinate to the ownership rights of Watts Trucking, which purchased the dumpsters for value not in the ordinary course of business and received them without knowledge of the unperfected security interest.

Gooseneck contends that defendants did not raise this "failure of perfection" argument at trial and are therefore barred from pressing it on appeal. This claim, however, is without merit.

Defendants pursued this line of argument a number of times in the district court. The pre-trial order highlighted the contention three times. In its statement of the case, Watts Trucking claimed that "[t]he UCC-1 was defective and therefore constitutes no notice to Watts of AG Products' security interest." As a contested issue of fact, the parties identified whether "[Gooseneck] perfected its security interest in the Containers by filing a UCC-1 Financing Statement on August 16, 1993," and as a contested issue of law, the parties included "[w]hether [Gooseneck's] lien filed August 16, 1993 was valid."

The validity of Gooseneck's lien as to Watts Trucking also surfaced at trial. On the day of trial, Watts Trucking filed a brief attacking the UCC-1 as unperfected because it lacked the debtor's signature. Even after trial, defendants pursued the failure-of-perfection argument. Watts Trucking filed a post-trial

6

brief re-stating the argument, and it moved for judgment under FED. R. CIV. P. 52(c) at the close of the evidence on the same ground.  Given all these statements of the failure-of-perfection argument, Gooseneck's claim that defendants are raising a new issue on appeal is unfounded.

Neither can Gooseneck successfully argue that Watts Trucking is precluded from contesting the validity of a lien the state court already had declared valid.  While a Texas court did approve the enforceability of the lien in a case brought by Gooseneck to enforce the lien *against Texas Waste*, Watts Trucking was not a party to that suit and thus could not have appealed the judgment or argued that a defect in the UCC filing rendered the lien invalid.

To invoke collateral estoppel, or issue preclusion, the invoking party must establish that the facts sought to be litigated in the second case were fully and fairly litigated in the prior action, that those facts were essential to the judgment in the first action, and that the parties in the second case were cast as adversaries in the first action.  *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex. 1984); *Benson v. Wanda Petroleum Co.*, 468 S.W.2d 361, 362-63 (Tex. 1971).  This last element is missing here.  Watts Trucking is a separate entity from Texas Waste and was never in privity with Texas Waste, the defendant in the state court action.  Because Watts Trucking was not cast as an adversary in the first case, the resolution of that action does not control what it may argue now.

Gooseneck also makes a vain attempt to cast defendants'

failure-of-perfection argument as a defense that FED. R. Civ. P. 8(b) would require to be "set forth affirmatively" in the answer to the initial complaint. In arguing that Gooseneck's security interest was imperfect, and thus was subordinate to Watts Trucking's interest, defendants are not setting forth an affirmative defense; they are simply contesting an element of Gooseneck's *prima facie* conversion caseSS*i.e.*, that its right to the dumpsters was superior to that of Watts Trucking. A denial that an essential element of a claim exists is not the same as an affirmative defense to the claim and need not be included in the answer under rule 8(b). *Compare* rule 8(b) *with* FED. R. CIV. P. 8(c).

Gooseneck then argues that the cross-appeal should be dismissed because the defendants/cross-appellants briefed the wrong lawSSthat of Texas instead of that of Oklahoma, the state where the debtor resides. Gooseneck points to UCC § 9.103(c)(2), which says that for "mobile goods" the law of the jurisdiction in which the debtor is located governs the perfection and the effect of perfection or nonperfection of a security interest. Gooseneck notes that the debtor here, Mid Western, was an Oklahoma corporation and that Oklahoma law thus should apply. Because defendants briefed Texas secured transactions law, Gooseneck reasons, the failure-of-perfection argument is barred because it is not accompanied by a proper legal analysis, as required by FED. R. APP. P. 28(a)(c).

Gooseneck has never previously asserted that the Texas UCC does not govern the security interest here, and Texas law in fact

8

would control, unless the dumpsters at issue were "mobile goods" rather than "ordinary goods," a question appropriate for the trial court.  *See* TEX. BUS. & COM. CODE ANN. § 9.103 (Vernon 1994).  Indeed, Gooseneck did not object to the pretrial order, which stated that there were no conflict-of-law issues to resolve and implied that there were no state statutes or regulations at issue other than those included in Vernon's Texas Statutes.[1]  Moreover, the district court expressly tested the validity of Gooseneck's financing statement "[u]nder Texas law," and Gooseneck never attacked this decision in any post-trial filing, nor has it cited to the record to show where it preserved its position about the applicability of Oklahoma secured transactions law.

Gooseneck acquiesced in the district court's choice of Texas law as controlling the issue of UCC-1's validity, and it is a little late in the day for Gooseneck to change its tune.  The position Gooseneck took in the district court binds it on appeal, particularly as its position on appeal requires resolution of a factual issue regarding the mobility of the dumpsters.  *See American Int'l Trading Corp. v. Petroleos Mexicanos*, 835 F.2d 536, 540 (5th Cir. 1987); *Shelak v. White Motor Co.*, 581 F.2d 1155, 1160 (5th Cir. 1978).

On the merits, Gooseneck claims that, under both Oklahoma and

---

[1] Item 20 of the pre-trial order states: "List conflict of law questions, if any: *Not Applicable*."  Item 21 states:  "A copy of any statute not found in the United States Code, Code of Federal Regulations or Vernon's Texas Statutes is attached hereto: *Not Applicable."* The plain implication is that the district court believed, and the parties understood, that Texas law was the only applicable state law in the case.

Texas law, Gooseneck's security interest was perfected, despite the lack of the debtor's signature. Because Gooseneck is wrong with respect to the law of both states, we need not address the issue of which state's law appliesSSan issue that turns on the factual question of whether the dumpsters are "mobile goods," *see* TEX. BUS. & COM. CODE ANN. § 9.103 (Vernon 1994), and that we are consequently ill-equipped to resolve.

While Gooseneck claims that Oklahoma's secured transactions law does not require the debtor's signature as a precedent to perfection, even a cursory look at that state's law shows that the debtor's signature is required. Section 9-402(1) of Oklahoma's UCC includes the signature of the debtor as an essential element of a sufficient financing statement, *see* OKLA. STAT. ANN. tit. 12A § 9-402(1), and courts interpreting Oklahoma law on this issue have required the debtor's signature for perfection. *See, e.g., Pontchartrain State Bank v. Poulson*, 684 F.2d 704, 705, 706-07, 708-09 & nn. 1,2 (10th Cir. 1982); *Wilmot v. Central Okla. Gravel Corp.*, 620 P.2d 1350, 1353-54 (Okla. Ct. App. 1980).

Citing § 9-402(2), Gooseneck states that Oklahoma permits a financing statement to be sufficient when it is signed by the secured party instead of the debtor. Gooseneck apparently fails to read the whole of that statutory provision. Section 9-402(2) permits a secured party's signature to be sufficient only for certain classes of collateral that do not include the dumpsters

10

here.[2]

Texas law also requires the presence of the debtor's signature to create a valid financing statement. *See* TEX. BUS. & COM. CODE ANN. § 9.402(a) (Vernon 1994). Without a UCC-1 signed by the debtor, Gooseneck at most held an unperfected lien.[3] *Id.; Sommers v. Int'l*

_____

[2]The statute provides:

> A financing statement which otherwise complies with subsection (1) is sufficient when it is signed by the secured party instead of the debtor *if it is filed to perfect a security interest in*:
>
> (a) collateral already subject to a security interest in another jurisdiction when it is brought into this state, or when the debtor's location is changed to this state . . .; or
>
> (b) proceeds . . . if the security interest in the original collateral was perfected . . .; or
>
> (c) collateral as to which the filing has lapsed; or
>
> (d) collateral acquired after a change of name, identity or corporate structure of the debtor . . . .

12A O.S. § 9-402(2) (emphasis added). Because the dumpsters do not fit into any of these four categories, the subsection does not apply.

[3] It may seem harsh that a "technicality" such as a missing signature could subordinateSSand sometimes, as in this case, destroySSa party's security interest in collateral it believes is valid security. Gooseneck argues that the missing signature should not weaken its security interest, because Watts Trucking could easily have learned of Gooseneck's interest in the dumpsters had it made reasonable efforts to discover any encumbrances on the property. Gooseneck also points to caselaw holding that "[s]ubstantial compliance is sufficient to satisfy the requirements of § 9.402." *Crow-Southland Joint Venture No. 1 v. North Fort Worth Bank*, 838 S.W.2d 720, 723 (Tex. App.SSDallas 1992, writ denied). This court, however, has previously rejected Gooseneck's arguments:

> When the state legislature swept away all statutes and judicial precedents concerning secured transactions in personal property, tangible and intangible, it never intended that the simpler requirements could be ignored. The process of simplification of statutory procedures does not give license to omit one of the simpler requirements.
>
> It is true that the legislature did provide in [UCC § 9-402(5)] that
>
> > (5) A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading.
>
> Obviously this pertains to minor errors in the contents of the

(continued...)

11

*Bus. Machs.*, 640 F.2d 686, 689 (5th Cir. Unit A Mar. 1981); *Republic Nat'l Bank v. Fitzgerald (In re E.A. Fretz Co.)*, 565 F.2d 366, 369-73 (5th Cir. 1978). Consequently, § 9.301, which identifies persons who take priority over unperfected security interests, determines whose interest in the dumpsters had priority in this case.

We agree with defendants that all the elements of § 9.301 are met, and that Gooseneck's interest was therefore subordinate to that of Watts Trucking. First of all, Watts Trucking bought the dumpsters not in ordinary course of business. A buyer in ordinary course of business buys "from a person in the business of selling goods of that kind . . . ." TEX. BUS. & COM. CODE ANN. § 1.201(9) (Vernon 1994). Because Mid Western, the seller, was not "in the business of selling" dumpsters, Watts Trucking was a buyer not in ordinary course of business.[4]

---

(...continued)
statement and does not relate to one of the formal requisites of a financing statement such as the signatures of the secured parties.

*Republic Nat'l Bank v. Fitzgerald (In re E.A. Fretz Co.)*, 565 F.2d 366, 373 (5th Cir. 1978).

[4] Gooseneck notes that, in the definition of "buyer in ordinary course of business," the code defines "buying" so as to exclude "a transfer . . . in total or partial satisfaction of a money debt." TEX. BUS. & COM. CODE ANN. § 1.201(9) (Vernon 1994). Gooseneck thus argues that Watts Trucking was not a "buyer not in ordinary course of business" because part of the consideration it gave for the dumpsters was satisfaction of a debt owed by Mid Western. This argument fails for two reasons.

First, § 1.201 defines "buying" for the purposes of identifying a "buyer in ordinary course of business." The sentence precluding debt satisfaction transactions from being "buying" simply operates to exclude debt satisfaction transactions from those transactions that otherwise would make a purchaser a "buyer in ordinary course of business." We should not lift the sentence from its context and interpret it to mean that any purchase that involves a debt satisfaction as consideration is not "buying." Section 1.201(9) merely identifies those buyers who are buyers in the ordinary course of business. All other buyers, even those who buy
(continued...)

12

Watts Trucking also obviously gave value for the dumpsters, paying $20,500. While a portion of this was satisfaction of a debt Mid-Western owed, the consideration Watts Trucking gave certainly constituted "value."[5]

Finally, Watts Trucking received delivery without knowledge of the unperfected security interest. Actual, not constructive, knowledge forms the litmus test under § 9-310(a)(3). *See* TEX. BUS. & COM. CODE ANN. § 1.201(25) (Vernon 1994) ("A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it."). The district court found that Watts Trucking entered its agreement to purchase the containers on November 3, 1993, and that Kemp began to take possession of the containers in late November or early December 1993. The parties stipulated that "[t]he [c]ontainers have been under the control of Watts Trucking Service, Inc. at all times since December 1, 1993." The key question, then, is whether defendants had actual knowledge of Gooseneck's unperfected security interest in the dumpsters as of December 1993.

_____

(...continued)
by satisfying a debt, are buyers not in the
ordinary course of business. *See Chase Manhattan Bank, N.A. v. J & L Gen. Contractors, Inc.*, 832 S.W.2d 204, 211 (Tex. App.§§Beaumont 1992, no writ) (holding that trucking company was buyer not in ordinary course of business where it satisfied a debt of $681,615 in exchange for property worth $630,000).

Second, even if the sentence defining buying in § 1.201(9) did apply to buyers not in the ordinary course of business, Watts Trucking still would have bought the dumpsters. It did so by fully canceling a debt *and* giving two cashier checks for the containers. Money was exchanged here; this was not only a debt-cancellation transaction.

[5] *See* TEX. BUS. & COM. CODE ANN. § 1.201(44) ("[A] person gives 'value' for rights if he acquires them . . . in total or partial satisfaction of a pre-existing claim."); *Chase Manhattan Bank, N.A. v. J & L General Contractors, Inc.*, 832 S.W.2d 204, 211 (Tex. App.§§Beaumont 1992, no writ) (holding that purchaser of equipment gave value when it satisfied debt).

13

Watts and Kemp never checked the UCC-1 filings to see whether Gooseneck had a lien, nor did the UCC require them to do so. They both testified that they lacked actual knowledge of any such lien, and neither Watts nor Kemp actually knew of any lien on the dumpsters when Watts Trucking bought them. The record suggests that the first time Watts Trucking or Kemp would have had any idea that Gooseneck might have a lien was March 1994, when a Gooseneck sales representative saw the containers in Texas Waste's yard and contacted Kemp to discuss Gooseneck's interest in the containers. Given these facts, it is evident that Watts Trucking had no actual knowledge of Gooseneck's lien when it received delivery.

Under § 9.301(a)(3), Watts Trucking's interest in the dumpsters is superior to Gooseneck's unperfected security interest, which was imperfect because the UCC-1 filing lacks the debtor's signature. Hence, under § 9.301(a)(3), Gooseneck's interest is subordinate to that of Watts Trucking§§a buyer not in ordinary course of business who gave value for the dumpsters and received them without knowledge of Gooseneck's unperfected security interest. Because Gooseneck does not have a right to the dumpsters superior to that Watts Trucking holds, the defendants cannot be liable for conversion.[6]

The judgment is REVERSED and RENDERED in favor of defendants.

---

[6] *See Chase Manhattan*, 832 S.W.2d at 211 (rejecting bank's conversion claim against purchaser of collateral where bank's financing statement was insufficient and bank's security interest was therefore subordinate to right of purchaser).